**Harry H. ROBERTS, Respondent,**

v.

**EMERSON ELECTRIC MANUFACTURING COMPANY, a Corporation, Appellant.**

No. 47786.

Supreme Court of Missouri,
Division No. 1.

July 11, 1960.

Motion for Rehearing or to Transfer to Court en Banc Denied Sept. 12, 1960.

R. H. McRoberts, R. H. McRoberts, Jr., St. Louis, for defendant-appellant, Bryan, Cave, McPheeters & McRoberts, St. Louis, of counsel.

C. E. Starkloff, St. Louis, for plaintiff-respondent.

COIL, Commissioner.

Harry Roberts brought an action for actual and punitive damages against The Emerson Electric Manufacturing Company for its alleged failure to have complied with the provisions of Section 290.140 RSMo 1949, V.A.M.S. (the service letter statute) in that Emerson allegedly failed to furnish Roberts with a letter "truly stating for what cause" he had been discharged. We shall refer to the parties as they were designated in the trial court. A jury awarded plaintiff $15,600 actual and $2,200 punitive damages and defendant has appealed from the ensuing judgment.

■ Defendant contends that plaintiff failed to make a submissible case for the reason that the evidence was insufficient to show that the letter furnished plaintiff did not truly state the cause of his discharge. In determining that question we view the evidence in the light most favorable to plaintiff, give him the benefit of the reasonable inferences to be drawn

therefrom and, of course, disregard defendant's evidence unfavorable to plaintiff.

Plaintiff had worked for defendant for a period of thirty-one years with the exception of a total period of three or three and a half years occurring at different times during the total span of his employment. He was discharged on October 8, 1956. At that time and for eleven years immediately prior thereto he was a class A refrigeration man and for some time had been assigned to work in connection with a "cold room" used in testing gun turrets which were manufactured by Emerson. The "cold room" was 20 feet square and 50 feet high. Gun turrets were there subjected to extremely low temperatures to determine their suitability for use at high altitudes and in arctic regions. Plaintiff and others in like capacity on other shifts occupied an adjacent room and viewed the cold room through a window. In the adjacent room was a recorder which reflected the temperature in the cold room. The recorder was a circular disk about 12 inches in diameter on which was placed a circular paper chart printed to reflect temperatures for 24 hours. A stationary pen recorded a continuous red line on the chart which indicated the temperature in the cold room from the time a new chart was installed for 24 hours thereafter or until the chart was sooner removed. In order to more efficiently create extremely cold temperatures the cold room would first be completely dehydrated by heating to a temperature of between 120 and 135 degrees Fahrenheit. When the desired maximum temperature had been reached, it would be maintained until plaintiff or some other person in charge (depending on the shift) would receive directions to begin lowering the temperature for the tests. (The time when the procedure to lower the temperature began depended upon when the inspectors, both company and Air Force, wished to run the tests.)

Plaintiff said that on October 2, 1956, he had a cold and complained about the long hours he had been working and asked the "day men" if they would share some of the overtime. They had refused and plaintiff agreed to "do his best" and, on October 3, was to and did work a double shift, from 3 p. m. on the third until 7 a. m. on the fourth. When plaintiff began work on the third there was a chart on the temperature recorder. At about 12:30 a. m. on the fourth, plaintiff put a new chart on the recorder. About 5:10 a. m. plaintiff removed the chart which he had put on at midnight and replaced it with a new one. Plaintiff changed charts at 5:10 because he realized that he had made a mistake in regulating the temperature and, as a result, the cold room temperature, after rising to about 137 degrees, had quickly and undesirably descended about 19 degrees in about 15 minutes. Plaintiff believed that he had made the error or errors in manipulating the controls to bring about the undesirable result because he was "worked out," was tired, was working too long, had a cold, and was exhausted. He said he wished to use the chart "in a grievance against the two refrigeration men for refusal to share this overtime," and therefore removed that chart (the one he had put on at midnight) and replaced it with a fresh one. Later (plaintiff says about 6 and Mr. Moeller says about 7), plaintiff took the chart which he had removed at 5:10 a. m. to the office of Mr. Moeller, the general foreman of the maintenance division. He saw Mr. Moeller outside the office and asked to speak with him. Mr. Moeller answered that he did not have time so plaintiff left the chart on Moeller's desk and went home.

Plaintiff testified that during the afternoon of the fourth he received a call from the assistant plant manager advising that he had been suspended for "some kind of conduct." He thereupon called Mr. G. F. Craig, Emerson's vice-president in charge of industrial relations, who stated that he knew about the suspension but declined to discuss it over the telephone. Plaintiff then called a plant chairman of Local 1102 of IUE, AFL-CIO, and asked him to report the suspension to the local union president

for handling. Later the union president, Mr. Chrismon, called and said he would consult with Mr. Craig and would advise plaintiff later. The next day, October 5, plaintiff was examined by a doctor who found that he had pneumonia and diabetes. From the doctor's office plaintiff went to Mr. Craig's office and plaintiff had a faint memory that someone there had stated that there would be a hearing on the eighth with the president of the union in attendance. In any event, plaintiff called Mr. Craig at 8 a. m. on October 8 to inquire whether there was to be a hearing on that day and, upon learning that there was, advised Mr. Craig that he was ill with pneumonia and diabetes and could not be there and that he had a letter from his doctor describing his condition, and plaintiff assumed that Mr. Craig would postpone the hearing. On October 11 he received a telephone call from Mr. Smith, Mr. Craig's assistant, who said that plaintiff's prior suspension had been converted into a discharge. Thereafter, on November 5, Mr. Smith, as Emerson's personnel manager, confirmed the telephone conversation of October 11 and stated in part, "your suspension pending discharge was converted to discharge for falsification of records in a formal hearing held in Mr. Craig's office on October 8, 1956. As mentioned during our telephone conversation this hearing was conducted in accordance with the relevant provisions of the contract." On November 15, plaintiff called Mr. Craig and asked for a further hearing but was advised that his services had been terminated.

Defendant's exhibit C was a chart which presumably was the one plaintiff put on the recorder about 5:10 in the morning of the fourth. Plaintiff testified that the date appearing thereon was in his handwriting. That chart showed a red temperature line from 12:30 until 5:10 a. m. which the parties agree was "counterfeit" in that it was made by manually turning the recorder plate so that the stationary pen would make a uniformly curved red line, and was not made by the automatic operation of the recorder. That "counterfeit" line indicated a constant temperature from 12:30 to 5:10 on the fourth of about 117 degrees. The red line on exhibit C from 5:10 to 7:15 on the fourth when that chart was removed was a "wavy" line such as was normally made by the automatic operation of the recorder. Plaintiff denied that he had caused the "counterfeit" line to be on the chart (exhibit C) which showed the temperature during the period from 12:30 to 5:10 a. m. (According to plaintiff, the period from 12:30 to 5:10 a. m. on the fourth was covered by the chart he took to Mr. Moeller's office.) Plaintiff denied that he had ever falsified any of defendant's records and denied that he had been guilty of any unsatisfactory conduct or anything that could be construed as such which had any connection with his discharge. He also denied that he had ever admitted that he falsified the temperature record or that he attempted to destroy exhibit B (another chart to be hereinafter explained). He admitted that he had been suspended for five days in September 1955 for using a company typewriter for personal business, and that he had had difficulties in the past with his supervisors; that at one time he believed two of them were building a case against him to get him fired; that one time he had had some trouble about the way he ran the cold room, letting moisture and water accumulate; and that in April 1950 he had written Mr. Craig and asked for a conference about matters which he contended constituted "discriminatory operations" against him by two Emerson employees.

On two or three occasions within a week or so before plaintiff was discharged, one Griffin, a fellow employee who helped set up the guns and turrets in the cold room, told plaintiff that he, Griffin, was going to get plaintiff fired unless plaintiff started operating the doors in the cold chamber like Griffin wanted them operated, rather than as plaintiff had been operating them for the past ten or eleven years.

Plaintiff conceded that after his discharge he did not follow the procedure provided in Emerson's union contract whereby he could have appealed Mr. Craig's decision discharging him to Emerson's operating vice-president and from there could have had the matter arbitrated. He had gone to the National Labor Board and, after consultation, did not file a formal claim with the board but received a withdrawal card from the union. He did nothing further about his discharge by defendant until he consulted with a lawyer in February 1957.

On February 18, 1957, plaintiff, on advice of counsel, directed a letter to Emerson's president requesting a service letter stating the true cause for the termination of plaintiff's services. Defendant replied, through Mr. Craig, by letter of February 21, 1957, showing the dates of plaintiff's employment and stating that on October 8, 1956, he had been "discharged for falsification of company records and unsatisfactory conduct." On March 11, 1957, plaintiff addressed another letter to defendant's president describing Mr. Craig's letter as not a "valid service letter to which I am entitled under the statute," and insisting that a proper letter be furnished in order that he might obtain other employment. On March 20, 1957, defendant supplemented the prior letter by one containing a more detailed description of plaintiff's services in his various employment classifications and describing those services as "generally satisfactory" except for the typewriter incident in September 1955 when plaintiff was suspended for five days; describing in detail the manner in which plaintiff had allegedly falsified records, stating that he had turned in false charts indicating that proper temperature had been maintained and further stating that plaintiff had admitted that he had torn up the actual chart and substituted a "manually drawn" chart; and referring to the hearing of October 8, 1956, not attended by plaintiff, which led to his discharge. On May 3, plaintiff addressed another letter to defendant's president stating that neither of defendant's letters was a service letter stating the true facts and again requesting a letter "truly stating the facts about my employment and discharge." Counsel for defendant replied to that letter on May 8, 1957, suggesting that plaintiff had not stated wherein Mr. Craig's letter of the twenty-ninth was deficient or failed to comply with the statute and that if he would advise what additional facts he wished and if they were called for by the statute, the writer would see that he received a letter truly stating such facts, or that if plaintiff felt that the facts stated were incorrect, then if he would point out wherein he thought they were, the company would give consideration to any such statement. Plaintiff filed the present suit on May 14, 1957.

Plaintiff testified that he was earning an average, not including overtime, of about $100 per week and, with overtime, about $7,000 a year, at the time of his discharge. Since discharge and to trial time, April 21, 1959, he had earned about $700 driving for Yellow Cab Company for a period of four months and about $300 doing some odd jobs. He had tried to get work at other electrical and refrigeration companies but personnel of most of the companies to which he had applied had read the service letter and he had not obtained a job.

Plaintiff's doctor testified that on October 5, 1957, plaintiff had bronchial pneumonia and that he was a diabetic; that he gave him penicillin and streptomycin and 12 units of insulin. He saw plaintiff again on October 8 when plaintiff was mildly improved but he had a persistent cough and a slight bronchial asthma. He saw plaintiff thereafter on October 11, 13, 15, 18, 22, and 25. The doctor said that the pneumonia and diabetes which plaintiff had would have affected plaintiff's memory.

Plaintiff's witness Jack Moeller, who had been with Emerson for eighteen years and had been general foreman in charge of maintenance since September 1956, testified that he saw plaintiff about 7 a. m. on

October 4, 1956, at which time plaintiff handed him a chart stating that here is the chart from the firing range. Moeller handed the chart to plaintiff's foreman, Leroy Vaninger. The chart was whole and not torn, but the witness did not examine the temperature line thereon.

Defendant's evidence was substantial and to the general effect that plaintiff, upon discovering that he had improperly handled the temperature controls on the morning of October 4, had removed the chart which reflected his mistake, replaced it with a chart upon which he caused a red line to falsely show a constant temperature during the period of his inattention, and later tore the chart which truly reflected the actual temperature into small pieces which he threw into a trash can some distance from his station; that thereafter employees searching therefor discovered the pieces of the chart and pieced them together (that chart was in evidence as defendant's exhibit B); that plaintiff had admitted that he tore up the true chart and had substituted one on which he had falsified the temperature line and had thrown himself on the company's mercy, seeking from Mr. Craig by personal plea and through his union representatives, only another chance. Defendant's evidence further showed that there had been many instances during the time of plaintiff's employment which a jury reasonably could have found constituted "unsatisfactory conduct."

 Inasmuch, however, as plaintiff was not bound by defendant's evidence and was not bound by the testimony of his own witnesses (some of which strongly supported defendant's contention) where his own testimony or other evidence adduced by him was contrary thereto, and inasmuch as the jury was entitled to believe all or none of any witness's testimony or believe it in part and reject it in part, Kickham v. Carter, Mo., 314 S.W.2d 902, 905 [1], it is unnecessary for us to review in detail the evidence adduced by defendant or evidence adduced by plaintiff by which he was not bound.

We call attention, however, to the testimony of one of defendant's witnesses which supported a reasonable inference favorable to plaintiff. Henry Griffin, defendant's employee who plaintiff said had threatened to get him fired, testified that usually plaintiff would leave any temperature chart that had been completed during plaintiff's tour of duty on Griffin's tool box, and that he, Griffin, would have it checked and initialed by the company and Air Force inspectors and, if approved, the chart was stamped and filed. He said that on the morning of October 4 he went on duty about 7:15; that there was no chart on the tool box and there was a chart on the recorder; that he inquired of the refrigeration man who had relieved plaintiff whether he had seen a completed chart; that upon being informed that he had not, both he and the refrigeration man looked for the priorly completed chart and finally found the pieces of defendant's exhibit B in a 50-gallon trash drum. Griffin explained that the pieces of the temperature chart were beneath discarded targets that had been put in the drum the day before. He said that he had suspected immediately that plaintiff had destroyed the chart and that is why he was searching and why he finally looked in the waste drum which was located a considerable distance from plaintiff's employment station.

Further, defendant's witness, James Menas, an Emerson employee and a member of the union's executive board, testified that Mr. Craig had told him that plaintiff had called and said that he was ill on Monday which was the day of the hearing, and that on the preceding Friday, Mr. Clark, plant chairman of Local 1102, had said that plaintiff was sick.

Defendant contends that inasmuch as the present action is not a suit for wrongful discharge, it was immaterial whether plaintiff was actually guilty of the acts with which he was charged, and that the only

question was whether the letter truly set forth the cause, in the sense of the reason, for the discharge and not whether the employee was discharged for just cause. Defendant proceeds with the argument that the "undisputed evidence" shows that Mr. Craig had reasonable grounds to and did believe that plaintiff was guilty of unsatisfactory conduct and that he had falsified company records, and that since he honestly and in good faith so believed, the letter truly stated the reason for plaintiff's discharge. If we tentatively assume defendant's premise, a matter we shall hereinafter discuss in connection with another of defendant's contentions, defendant's position is, nevertheless, fallacious. That is because plaintiff's evidence was such that a jury reasonably could have found that the true cause of his discharge was not any unsatisfactory conduct and was not falsification of company records and that Mr. Craig so knew or, in the exercise of reasonable care, should have so known. The jury was entitled to believe plaintiff's trial testimony and if the jury did believe that testimony it was entitled to find that plaintiff had not falsified a chart and had not been guilty of any unsatisfactory conduct which was a cause of his discharge. Mr. Craig testified that plaintiff confessed to him the falsification of the record and had thrown himself on the company's mercy. If the jury did not believe that testimony but chose to believe plaintiff's specific denial thereof and plaintiff's other testimony, then the jury was entitled to also find that Mr. Craig did not in fact believe that the service letter truly stated the cause of plaintiff's discharge. In other words, in finding for plaintiff the jury reasonably could and for practical purposes had to disbelieve Mr. Craig's testimony and if the jury believed Mr. Craig testified falsely as to plaintiff's alleged confession, then surely it was a reasonable inference that Mr. Craig did not believe that the service letter truly stated the cause of plaintiff's discharge.

Defendant has failed to demonstrate wherein plaintiff's evidence, considered favorably from plaintiff's standpoint, and disregarding defendant's evidence to the contrary, falls short of supporting a submissible issue as to whether the service letter truly stated the cause of the discharge. Defendant cites Bourne v. Pratt & Whitney Aircraft Corp., Mo.App., 207 S.W.2d 533. That case, however, is direct authority for the proposition that plaintiff's evidence in the present case was amply sufficient to make a jury issue as to whether defendant had complied with section 290.-140 of the statutes. See also Heuer v. John R. Thompson Co., Mo.App., 251 S.W.2d 980, and Davenport v. Midland Bldg. Co., Mo.App., 245 S.W.2d 460. The basic fallacy in defendant's argument is its erroneous view that plaintiff was bound by defendant's evidence and by plaintiff's evidence contrary to plaintiff's own testimony.

■■ Defendant contends further that in any event the verdict of the jury was against the weight of the evidence. We usually do not weigh the evidence in jury-tried cases. In this case the credibility of the witnesses and the weight of the evidence were for the jury and it was for the trial court to say whether the jury's verdict was against the weight of the evidence. Nichols v. Bresnahan, 357 Mo. 1126, 212 S.W.2d 570, 572 [1–2]. It is only when there is complete absence of probative facts to support a verdict that we interfere. Siegel v. Ellis, Mo., 288 S.W.2d 932, 934 [1, 2]. We have held heretofore that there were probative facts to support the jury's verdict for plaintiff.

Defendant points out, however, that plaintiff's own testimony showed that he had had constant troubles and difficulties with his supervisors, that the typewriter incident heretofore mentioned had occurred, that he had had difficulties at the firing range, that he had admitted that he had committed certain other acts through the years. However, the evidence as a

whole supported a reasonable inference that even if the noted acts did at the time constitute unsatisfactory conduct, they had been dealt with at the time of commission and did not constitute a true cause for plaintiff's discharge in October 1956.

■ Defendant further points out that plaintiff conceded that in a pretrial deposition he had testified at length and in detail that he did not know what had happened on the night and morning of October 3–4. Defendant apparently contends that plaintiff should not now be permitted to take advantage of his trial testimony to the contrary in which he professed to remember and state the occurrences during that night and morning. The prior inconsistent testimony contained in the deposition of course affected plaintiff's credibility and the weight of his testimony, but those were matters for the jury. Defendant points also to the claimed lack of logic in some of plaintiff's testimony as, for example, that he removed the chart and gave it to Mr. Moeller for the purpose of using it as a grievance against the day refrigeration men; and to the claim that plaintiff's trial testimony was inconsistent with his subsequent actions in acquiescing in his discharge rather than taking the action open to him under the union contract. Those and similar matters were subjects for seemingly persuasive jury arguments but they did not wholly destroy the probative effect of plaintiff's trial testimony which the jury was at liberty to believe.

■ Defendant contends the trial court erred in giving plaintiff's damage instruction 5. That contention must be sustained for the reasons which will appear. Instruction 5 was:

"The Court instructs the jury that if you find in favor of the plaintiff, Harry Roberts, under the evidence and the instructions of the Court, then you will award him such sum as you find and believe from the evidence will fairly and reasonably compensate him; and in arriving at the amount, if any, of your verdict, you may take into consideration and account:

"1. The loss in wages or compensation to plaintiff resulting from the issuance of said letters, from the date of said discharge to this date;

"2. The damages, if any, which the plaintiff will sustain in the future by reason of failing to obtain employment by reason of the issuance of said letters.

"3. The mental anguish, humiliation and outrage, if any suffered by plaintiff and directly caused by reason of the issuance of said letters.

"And the Court further instructs you, in addition to the above, you may award damages, if any, by way of punishment for the wrongful acts of the defendant, its agents or servants, if you find from the evidence that such acts were maliciously, wrongfully and willfully committed."

In considering the attacks made on instruction 5, it is important to know that plaintiff's sole verdict-directing instruction No. 1 was this:

"The Court instructs the jury if you find and believe from the evidence that on and prior to the 8th day of October, 1956, the plaintiff, Harry Roberts, was employed by the defendant, Emerson Electric Mfg. Co., a corporation, and on said date was discharged from the service of said corporation, and that said plaintiff had been employed by said corporation for a period of at least ninety days prior to said date, and that thereafter said plaintiff made a request or requests in writing to said corporation requesting them to issue to said plaintiff a letter duly signed by its superintendent or manager setting forth the nature and character of service rendered by such employee to said corporation and the duration thereof, and truly stating for what cause, if any, such employee has quit such service, and that such superintendent or manager failed or refused to issue a letter to the plaintiff, when so requested by the

plaintiff, truly setting forth the cause, if any, why said plaintiff was discharged, then your verdict shall be in favor of the plaintiff and against the defendant." See Bourne v. Pratt & Whitney Aircraft Corp., supra, 207 S.W.2d 540, 541, as to the propriety of the form of the foregoing instruction. Defendant's instruction 2 exactly conversed instruction 1. Instruction 3 was a credibility-of-witness instruction, 4 was on the burden of proof, and 6 was as to nine or more jurors returning a verdict.

The first paragraph of instruction 5 contained only a partial and incomplete direction as to the measure of damages. The instruction directed that if the jury found for plaintiff under the evidence and the other instructions (i. e., instruction 1) it would award him the sum it found and believed from the evidence "will fairly and reasonably compensate him." That direction is obviously incomplete. It contains no statement as to what plaintiff is to be compensated for and states no limitation requiring the jury to find that any amount awarded must have directly resulted from the defendant's failure to have issued a proper service letter.

Numbered paragraph 1 of the instruction assumed without requiring the jury to find that plaintiff lost wages or compensation as a result of "the issuance of said letters" (probably more accurately, the failure to issue a proper service letter rather than the issuance of the improper ones). It is true that the phrase preceding numbered paragraph 1 directed the jury that "in arriving at the amount, if any, of your verdict, you may take into consideration and account: * * *." It is clear, however, that "the amount, if any" referred to the total amount of the jury's award and that the "if any" constituted no requirement that the jury find that the item numbered 1, loss of wages, was in fact sustained.

The final paragraph of the instruction assumed without requiring the jury to find that defendant committed "wrongful acts," failed to tell the jury what constituted

"wrongful acts" referred to, and did not limit the "wrongful acts" to the failure of the defendant to issue a service letter which truly set forth the cause of plaintiff's discharge.

Instruction 5 is obviously erroneous in the respects noted and, without deciding whether each noted defect alone constitutes reversible error, we are of the opinion that the instruction is reversibly erroneous. Plaintiff's verdict-directing instruction was abstract and directed a verdict "without requiring a finding of essential fact issues necessary to establish that the letter did not truly state the cause for the termination of plaintiff's service," Bourne v. Pratt & Whitney Aircraft Corp., supra, 207 S.W.2d 541 [7–9], and thus in no way cured the deficiencies in the damage instruction. There was no other instruction which makes it likely that a jury would have understood that the court did not mean to assume by the language of instruction 5 that plaintiff did in fact sustain loss of wages or compensation. We know of nothing which would make it probable that the jury understood that its award was to be limited to the damages directly resulting from the failure of the defendant to have issued a service letter truly stating the cause of plaintiff's discharge; and it seems fairly certain that the jury did not understand that the "wrongful acts" of the defendant was in fact only one matter, viz., defendant's failure, if any to have furnished a proper service letter, and that plaintiff was not entitled to any damages, actual or punitive, by reason of any other "wrongful acts" of defendant which the jury might find defendant had committed as to plaintiff, including, e.g., failure to have continued plaintiff in its employ irrespective of plaintiff's actions with respect to the temperature records.

We are convinced that the defects of instruction 5 are not in any way cured or made harmless by any other instruction or by any other circumstance of record. Consequently, we are of the view that the

instruction is prejudicially erroneous and that the case must be reversed and remanded for the error in giving that instruction.

■ Inasmuch as the case may be retried, we should mention two other of defendant's contentions with respect to instruction 5. Defendant contends that the instruction is erroneous because it permits the jury to award damages for mental anguish, humiliation, and outrage. Defendant relies upon Ackerman v. Thompson, 356 Mo. 558, 202 S.W.2d 795, 799 [7, 8]. That case holds that a plaintiff is entitled to recover for mental suffering where there is substantial evidence of defendant's actual malice. Present defendant contends that the evidence in this case affirmatively shows a complete absence of actual malice. We cannot agree. Such contention has been answered in effect by what we have said heretofore with respect to defendant's contention as to a submissible case. If the jury believed plaintiff's testimony, it reasonably could believe that defendant's witnesses testified falsely to the effect that plaintiff admitted that he had falsified the temperature records and, if so, the jury was entitled, for that reason alone, to find actual malice. Defendant also contends that instruction 5 is erroneous because it authorizes punitive damages. What we have said with respect to actual malice will suffice to indicate that we are of the view that the record was not totally lacking in proof from which the jury could have found actual malice and ill will sufficient to have supported an award of punitive damages. And certainly there was evidence to support a finding of legal malice; that is, that a wrongful act was intentionally done without just cause or excuse, and legal malice alone will support a judgment for punitive damages. Ackerman v. Thompson, supra; Davenport v. Midland Building Co., supra, 245 S.W.2d 464 [3].

We observe finally with respect to instruction 5 that defendant makes other attacks on it which we need not discuss inasmuch as we do not consider that such additional matters would, standing alone, cause the instruction to be reversibly erroneous. We are of the opinion, nevertheless, that defendant's other attacks are well taken criticisms of the instruction and that plaintiff would do well to heed them when he draws a damage instruction in the event of a retrial.

■ Again, because of a probable retrial, we need to notice defendant's contention that the trial court erred in refusing to give either of its proffered instructions 1 and 2. Instruction 1 was: "The Court instructs the jury that if you find and believe from the evidence that G. F. Craig, defendant's Vice-President in Charge of Industrial Relations, made the decision, on behalf of defendant, to discharge the plaintiff; that at the time of making such decision said G. F. Craig had reasonable grounds to believe, and did in truth and in fact believe, that the plaintiff had falsified company records, and had been guilty of unsatisfactory conduct; and that on March 29, 1957, said G. F. Craig still had reasonable grounds to believe, and did in truth and in fact believe, that the plaintiff had falsified company records, and had been guilty of unsatisfactory conduct, then and in that event plaintiff is not entitled to recover, and your verdict should be in favor of defendant." Instruction 2 was like instruction 1 except that it limited the time when Mr. Craig believed that plaintiff had falsified company records and was guilty of unsatisfactory conduct to the time when he made the decision to discharge plaintiff.

As we understand, defendant contends, in effect, that it was entitled to have submitted to the jury the theory that if a person, admittedly the proper corporate agent to decide whether to discharge an employee, uses reasonable care to make and in making an investigation, and as a result thereof has reasonable grounds to believe and does in fact and in good faith believe that the employee has falsified records and has been guilty of unsatisfactory conduct, and de-

cides that because thereof the employee should be discharged and assigns those reasons as the cause of plaintiff's discharge, then the employer has "truly stated" in the service letter the cause of employee's discharge, even though the corporate agent's findings were in fact erroneous in that they were based upon false information acquired by him during the investigation. Defendant cites no case to support its position and we find no case in which the contention has been specifically considered. At first blush it appears that there is merit in defendant's position because Section 290.140 RSMo 1949 V.A.M.S. makes it the duty of "the superintendent or manager" of the corporation to furnish the service letter and provides that the failure or refusal of the superintendent or manager to issue the letter shall make the individual guilty of a misdemeanor and provides for his punishment by a fine or imprisonment or both. But further examination discloses that it has been held ever since the relatively early case of Cheek v. Prudential Ins. Co., Mo., 192 S.W. 387, 391 [2], L.R.A.1918A, 166, that "the statute makes it the duty of the corporation acting through its superintendent or other proper officer to issue the letter, and not the duty of such officer acting in his individual capacity." And in the case of State ex rel. Terminal R. R. Ass'n of St. Louis v. Hughes, 350 Mo., 869, 169 S.W.2d 328, 330 [4, 5], it was stated that the service letter statute is properly divided into two parts, the first being remedial in so far as it places the duty on the corporation through its agent to issue the letter and the second being penal in so far as it renders the corporate agent guilty of a misdemeanor for failure to comply with the statute's provision. And in Burens v. Wolfe Wear-U-Well Corp., 236 Mo.App. 892, 158 S.W.2d 175, 178 [1], the court held that the interpretation of the statute made in the Cheek case resulted in the conclusion that a corporate manager or other agent was not liable for damages for refusing to issue the statutory service letter.

From the foregoing, it seems reasonably clear that in any criminal proceeding under the statute, wherein an individual is charged with refusing to issue a service letter or with having issued one which did not truly state the cause of an employee's discharge, the reasonable good faith belief of that individual that he was stating the true cause of the employee's discharge would be relevant and a valid defense, for in a criminal proceeding the question of intent would be present. Even proof of negligence on the part of the individual which resulted·in his failure to issue a service letter or the issuance of an improper one would probably be insufficient to sustain a conviction. It seems equally clear, however, that in a civil action for damages against the corporation under the remedial part of the statute (for which damages the defaulting corporation agent is not liable), the corporation is liable for having failed "to arm the employé with a letter stating the true cause of his discharge," Cheek v. Prudential Ins. Co., supra, 192 S.W. 391; and thus, in such an action, the corporation agent's beliefs, however honest and reasonable, are irrelevant on the question of the corporation's liability.

It follows, therefore, that the trial court did not err in failing to give an instruction directing a defendant's verdict on the theory of defendant's proffered instructions 1 or 2.

For the error noted in the giving of instruction 5, the judgment is reversed and the case is remanded for a new trial.

HOLMAN and HOUSER, CC., concur.

PER CURIAM.

The foregoing opinion by COIL, C., is adopted as the opinion of the court.

All concur.