Shay **RYBURN**, Respondent,

v.

**GENERAL HEATING & COOLING,
CO. Appellant.**

**No. WD 47708.**

Missouri Court of Appeals,
Western District.

May 10, 1994.

Motion for Rehearing and/or Transfer to
Supreme Court Denied June 28, 1994.

Application to Transfer Sustained
Aug. 15, 1994.

Case Retransferred Dec. 20, 1994.

Court of Appeals Opinion Readopted
Dec. 27, 1994.

Eugene F. DeShazo, Smith, Gill, Fisher & Butts, P.C. and Mark A. Jess, Kansas City, for appellant.

Michael W. Manners, Paden, Welch, Martin & Albano, P.C., Independence, for respondent.

Before BERREY, C.J., P.J., and BRECKENRIDGE and SMART, JJ.

SMART, Judge.

This case arises out of an action by an employee against his former employer for a violation of the Missouri service letter statute, § 290.140, RSMo 1986. Following a jury trial, Shay Ryburn was awarded $1.00 in actual damages and $47,500.00 in punitive damages. General Heating & Cooling Company ("GHC"), defendant, appeals the punitive damage award.

Judgment is affirmed.

Shay Ryburn began working in the heating and air conditioning business in the mid–1970's. In 1977, he started his own business as a heating and air conditioning dealer in the Kansas City area. He later sold that business and went to work for Frank Lyon Company, a wholesale distributor of heating and air conditioning equipment for the Bryant Company. Ryburn was very successful with this company. After his first year with Frank Lyon, he was paid on a straight commission basis. In the spring of 1987, after Frank Lyon decided to close its Kansas City operation, Ryburn went to work for GHC, a competitor of his former employer. GHC took over the Bryant product line in the Kansas City area. GHC had not formerly sold Bryant equipment. GHC's sales representatives were paid a base salary, with the opportunity to earn a small commission on sales. Ryburn, desiring a straight commission relationship, negotiated a compensation agreement providing for a substantial commission on sales. Ryburn's straight commission compensation was to begin after the first three months of his employment.

On June 22, 1987, Ryburn began working for GHC as a Territory Manager. Ryburn worked energetically, laboring from 12 to 14 hours a day. On September 30, 1987, after only three months on the job, Ryburn was terminated. His supervisor, Calvin Price, told Ryburn that he was being terminated as a result of customer complaints. After his termination, Ryburn's efforts to obtain employment in the heating and air conditioning industry were unsuccessful. In December, 1987, Ryburn took a job with Matthew Bender Company, a publisher of law books. In January, 1988, Ryburn mailed a service letter request to GHC pursuant to § 290.140, RSMo 1986. The request was received on January 25, 1988 and was referred to the vice-president of the company, Robert Heinzinger. Heinzinger obtained a copy of the service letter statute and studied it. He observed that the statute required a true statement of the cause of termination. He drafted a response to the letter for the signature of the company president. The letter omitted any discussion about the reasons for

Ryburn's termination. The entire text of the letter is as follows:

Dear Mr. Ryburn:

Our records indicate you were employed on June 22, 1987 as a territory manager calling on assigned heating and air conditioning dealers in the metropolitan Kansas City area for the purpose of insuring they were well informed and knowledgeable on the products and programs being offered by General Heating and Cooling Company.

You were discharged from the obligation to perform these services on September 30, 1987.

W.T. Tholen

President

Ryburn filed suit in December, 1989, alleging violation of the statute because the letter did not state the true cause of the termination of employment, as required by the statute. At trial, Heinzinger, who had since become president of the company, was the primary witness for GHC. Heinzinger testified that he did not state a reason for Ryburn's termination because he was afraid that to do so would damage Ryburn's future employment prospects. He also stated he believed he did not have to list a reason for discharge because there was not "cause" for firing Ryburn. It was just that things were not working out. He stated that Ryburn was not a bad employee, but that his employment with the company as a territory manager was "just not working out." He also stated that Ryburn was more aggressive than the kind of salesman GHC wanted. On cross-examination, Heinzinger stated that Ryburn was terminated because he was "not enjoying himself." GHC's former president, Terry Tholen, who was chairman of the board at the time of trial, testified that the reason Ryburn was fired was because of customer complaints, "poor performance" and a "terrible attitude." In contrast to the testimony of Ryburn, who had testified that he was never instructed to improve his job performance or told that he was doing an unsatisfactory job, Tholen stated that he had talked to Ryburn twice about deficiencies in his performance.

On February 9, 1993, a jury found in favor of Ryburn and awarded him $1.00 nominal damages and $47,500.00 punitive damages.

The trial court entered judgment in accordance with the jury's findings. GHC's post-trial motion was denied. GHC appeals from the trial court's ruling.

*Punitive Damages*

First, defendant challenges the trial court's award of punitive damages. In deciding whether plaintiff made a submissible case on the issue of punitive damages, we construe the evidence, along with all reasonable inferences to be drawn therefrom, in the light most favorable to plaintiff. *White v. James,* 848 S.W.2d 577, 578 (Mo.App.1993). The jury is free to believe all, part or none of any witness' testimony. *Delong v. Hilltop Lincoln–Mercury, Inc.,* 812 S.W.2d 834, 842 (Mo.App.1991).

Section 290.140, entitled "Letter of dismissal, when—failure to issue, damages—punitive damages, limitations," provides:

1. Whenever any employee of any corporation doing business in this state and which employs seven or more employees, who shall have been in the service of said corporation for a period of at least ninety days, shall be discharged or voluntarily quit the service of such corporation and who thereafter within a reasonable period of time, but not later than one year following the date the employee was discharged or voluntarily quit, requests in writing by certified mail to the superintendent, manager or registered agent of said corporation, with specific reference to the statute, it shall be the duty of the superintendent or manager of said corporation to issue to such employee, within forty-five days after the receipt of such request, a letter, duly signed by such superintendent or manager, setting forth the nature and character of service rendered by such employee to such corporation and the duration thereof, and *truly stating for what cause, if any, such employee was discharged or voluntarily quit such service.*

2. Any corporation which violates the provisions of subsection 1 of this section shall be liable for compensatory but not punitive damages *but in the event that the evidence establishes that the employer did*

*not issue the requested letter, said employer may be liable for nominal and punitive damages; but no award of punitive damages under this section shall be based upon the content of any such letter.*

(Emphasis added). The purpose of this statute is to discourage corporate employers from damaging the employability of former employees by furnishing false or misleading information as to their service or false reasons for their discharge. *Ball v. American Greetings Corp.*, 752 S.W.2d 814, 820 (Mo. App.1988). GHC claims the award of punitive damages cannot stand because it was based on the content of the service letter, and the statute clearly states that "no award of punitive damages ... shall be based on the content of any such letter." GHC is incorrect in this contention. In *Ball*, this court held that the failure to state a cause for discharge constitutes a refusal to issue the service letter. 752 S.W.2d at 821. Punitive damages are not recoverable when the service letter contains a cause for discharge, even if the stated cause is incorrect. *Id.* However, the failure to provide a reason for discharge is equivalent to non-issuance of the letter. *Ball*, 752 S.W.2d at 821; *see also Hills v. McComas Rentals, Inc.*, 779 S.W.2d 297, 300 (Mo.App.1989) (letter failing to provide duration of employment or character of service held equivalent to non-issuance of service letter).

GHC's letter, omitting the reason for discharge, constituted, as a matter of law, a failure to issue a service letter. *Id.* Ryburn was therefore entitled to at least nominal damages, and possibly punitive damages. We now turn to the issue of whether the trial court properly allowed Ryburn to submit a claim for punitive damages to the jury.

The service letter statute was originally enacted in 1905. Mo.Laws 1905, at 178. Prior to the 1982 amendments, the statute made no express provision for civil liability at all, providing instead for criminal penalties. The early case of *Cheek v. Prudential Ins. Co.*, 192 S.W. 387 (Mo.1916) held that the statute also created a right to recover damages re-

sulting from the non-issuance of the letter. The right of action found in the statute, the court held, supported awards of both actual and punitive damages. See Soebbing, *The Missouri Service Letter Statute*, 31 Mo. L.Rev. 505, 510–512 (1966).

■ It has been suggested that a major purpose of the 1982 amendments to the statute was to limit punitive damage awards to cases where no letter is timely furnished, and to preclude punitive awards based upon the content of the letter. *Martucci & Johnson, Recent Developments in Missouri: Labor and Employment Law*, 53 UMKC L.Rev. 509, 515 (1985). Presumably, the legislature found the spate of litigation concerning the wording of the statement of the true cause for discharge, combined with the threat of a substantial punitive damage award, to be creating excessive difficulties for business operators attempting to draft such letters in good faith. The legislature wished to remove an excessive focus on the content of the letter, and therefore modified the rules with regard to punitive submissions. But the legislature chose not to change the possibility that a claimant may obtain a punitive award where the employer declines to issue the letter. Thus, the language of the statute providing that when the employer fails or refuses to issue the requested service letter, the employer *"may be liable for nominal and punitive damages ..."* was not intended to expand existing rights of recovery, but simply to restate existing law as to cases where the letter is not furnished.

GHC contends that it was entitled to a directed verdict on Ryburn's claim for punitive damages because Ryburn failed to present sufficient evidence to show that GHC's omission of the reason for termination amounted to conduct justifying a punitive damages submission. Historically, liability for punitive damages is predicated upon either "malice in law" (the intentional doing of a wrongful act without just cause or excuse) or actual malice, spite, or ill will on the part of the defendant.[1] *E.g., Roberts v. Emerson*

---

1. In *Sanders v. Daniel Int'l Corp.*, 682 S.W.2d 803 (Mo. banc 1984) the court distinguished "legal malice" from "malice in law." The court

defined "legal malice" as bad faith conduct, *malo animo*, general wickedness, or a depraved inclination to do harm. *Id.* at 807–08. What the

*Electric Mfg. Co.,* 338 S.W.2d 62 (Mo.1960). In *Burnett v. Griffith,* 769 S.W.2d 780, 787 (Mo. banc 1989) the Supreme Court examined the level of malice necessary to support an award of punitive damages in an intentional tort case,[2] and decided that punitives may be allowed in cases of "conduct that is outrageous because of the defendant's evil motive or reckless indifference to the rights of others." The court adopted the instruction which now appears as the current MAI 10.01, setting forth this standard. The court in *Burnett* stated:

> Lest there be any confusion, in adopting the new instruction we do not overrule cases which have held that punitive damages require a wilful, wanton or malicious culpable mental state. The definitional concepts of those terms are included in the new MAI 10.01. Moreover, we do not intend to invent any new concept as to punitive damages by including the word "outrageous" in the new instruction.

*Id.* at 789. It is the concept of the alleged "outrageousness" of defendant's conduct which becomes the focus of GHC's attack on this appeal.

GHC suggests in its brief that the term "outrageous" as used in *Burnett* is equivalent to the term "outrageous" as used in connection with the tort of intentional infliction of emotional distress. We find such suggestion incorrect. We do not believe one can read *Burnett* to mean that the concept of outrageousness as an element of the tort of outrage (intentional infliction of emotional distress) is the same as the concept of outrageousness necessary for an award of punitive damages in a case such as this. It may seem anomalous that the standard for imposition of punitive damages might be a lower degree of outrageousness than the standard to award compensatory damages in a tort action of outrage. However, the reluctance of the courts to open the floodgates of claims for the tort of outrage have caused the courts to

maintain a very high threshold for such claims, requiring that the alleged conduct be both extreme and outrageous to a high degree. As discussed in the Restatement (Second) of Torts, § 46, with regard to liability for outrage:

> It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a *degree of aggravation which would entitle plaintiff to punitive damages for another tort.* Liability has been found only where the conduct has been so outrageous in character and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community....

(emphasis added). This language was quoted in *Pretsky v. Southwestern Bell Telephone Co.,* 396 S.W.2d 566, 568–69 (Mo.1965), which adopted the Restatement standard.

The Restatement standard for punitive damages for intentional torts also uses the word "outrageous" in connection with a defendant's "evil motive or reckless indifference to the rights of others." Restatement (Second) of Torts § 908(2) (1979). This language is quoted in *Burnett v. Griffith,* 769 S.W.2d 780, 789 (Mo. banc 1989), which adopted the Restatement standard as to punitive damages for intentional torts. Restatement § 908 makes no reference to § 46, but § 46 specifically compares the standard of liability for outrage to the standard of culpability necessary for a punitive damages submission for another tort.

■ Consequently, we conclude that the degree of outrageousness necessary to a punitive submission in a case such as this is not the same high threshold as the degree of outrageousness necessary for compensatory damages in a case of intentional infliction of

---

court in *Sanders* called "malice in law" was traditionally known as "legal malice" in Missouri. *See, e.g., Roberts v. Emerson Electric Mfg. Co.,* 338 S.W.2d 62, 71 (Mo.1960).

**2.** The parties in this case have assumed, and we assume, that a claim of violation of the service letter law is equivalent to an intentional tort for

purposes of the appropriate standard for submission of punitive damages. *Cf. Koehler v. Warren Skinner, Inc.,* 804 S.W.2d 780 (Mo.App.1990) (claim of violation of the Prevailing Wage Law, § 290.230 RSMo.1986; the *Burnett* standard was the appropriate standard).

emotional distress. This, indeed, is what we believe the Supreme Court meant in its remark in *Burnett* that the court did not intend "to invent any new concept as to punitive damages by including the word 'outrageous' in the new instruction." *Id.* at 789. We conclude that the Supreme Court, in electing to adopt the language of the Restatement, § 908, including the use of the word "outrageous," wished to focus on the matter of moral culpability so that the jury would not impose punitive sanction on a defendant for the mere commission of an intentional tort. "It is not so much the commission of the intentional tort as the conduct or motives— the defendant's state of mind—which prompted its commission that form the basis for a punitive damage award." *Id.* at 787.

■ Thus, even after *Burnett v. Griffith* it is sufficient for a punitive submission that there be evidence which would support a finding of outrageousness based upon a wanton mental state—a knowing and conscious disregard of the right or the welfare of another. The defendant's conduct may be outrageous due to the defendant's reckless indifference to the rights of others. *Id.* In this case, Ryburn's evidence supports the inference that GHC's reason for refusing to supply a service letter was the product of a wanton mental state. Ryburn offered evidence that he was lured into working for GHC by a bad-faith promise that, after an initial three month period, he would be given the opportunity of substantial monetary reward for effectiveness in sales work. He alleges that he worked long hours, provided needed expertise in knowledge of the Bryant units, and brought in a significant volume of business to GHC. He contends there were no deficiencies in his job performance. He alleges that as soon as GHC was educated about the Bryant product line and had benefited from Ryburn's customer contacts, he was fired. Ryburn contends he was fired because GHC did not want to pay him the substantial amounts he would have earned under the lucrative straight commission agreement, which was just about to go into effect at the time he was fired. Thus, plaintiff claims GHC failed to state the true reason for termination in the letter in order to avoid admitting its own bad faith in dealing with him.

The evidence shows that Heinzinger was fully cognizant of the statute governing the content of the service letter. Heinzinger understood that the statute applied to plaintiff's request since the company had more than seven employees and Ryburn had worked for GHC for more than 90 days. He knew the statute required a statement of the true cause of termination. He consciously chose to ignore its requirements. This is not a case of inadvertence, oversight, or mistake. Nor, under plaintiff's evidence, is it a case of poor judgment. The jury could believe GHC consciously and wantonly chose to place its own interests ahead of its duty to Ryburn under the statute. The jury was not required to believe Heinzinger's assertion that the only reason he did not include the true cause of discharge was because he did not want the letter to be disadvantageous to Ryburn. Even the tone of the letter Heinzinger drafted could be viewed as belying his assertion that he was motivated by a spirit of good will toward Ryburn. When the evidence is viewed in the light most favorable to plaintiff, the jury could reasonably infer that defendant refused to include the reason for termination in the letter because GHC did not want to admit its own bad faith in its dealings with Ryburn. Thus, the jury could find that GHC's conduct in refusing to provide a service letter was outrageous because of GHC's willful and defiant disregard of Ryburn's rights, or reckless indifference to his rights. While the jury may have disapproved of Ryburn's termination, and may have regarded *the termination* as outrageous, there was also evidence from which the jury could have found *the refusal to provide the service letter* to be outrageous. The trial court did not err in submitting the issue of punitive damages to the jury. Defendant's Point I is denied.

### *Criminal Guilty Plea*

■ Next, defendant asserts that the trial court erred in overruling its objection to a question put to Heinzinger on his cross-examination as to GHC's prior criminal guilty plea to mail fraud in federal court. GHC

apparently had pleaded guilty to mail fraud for forging its customers' rebate checks from the Carrier Corporation. GHC claims that the evidence was inadmissible as impeachment evidence under § 491.050, RSMo 1986, on the theory that it concerned a guilty plea and not a conviction. GHC further contends it was not admissible to impeach the witness' credibility because it was GHC's guilty plea and not the plea of Heinzinger, the witness. GHC further maintains the evidence was not relevant for any other purpose, and its admission confused and unduly prejudiced the jury.

■■■ It is unnecessary to address each of defendant's contentions concerning impeachment and relevance. Defendant is correct that, generally, character evidence is not admissible. *Farley v. Johnny Landoff Chevrolet, Inc.*, 673 S.W.2d 800, 803 (Mo.App. 1984). However, a party may contradict matters introduced on direct examination even when they involve issues of character. *Williams v. McCoy*, 854 S.W.2d 545, 558 (Mo.App.1993). At trial, Heinzinger testified on behalf of defendant. Heinzinger professed that he was "pretty proud of General Heating & Cooling." He added that it is "one of the best known distributors in the midwest, and so if you've worked for General Heating & Cooling, that looks good on your resume." He also stated that he was proud of GHC's reputation and "how well it treats people." On cross-examination, plaintiff's counsel asked Heinzinger whether GHC had pleaded guilty to mail fraud. Defense counsel's objection argued that a guilty plea could not be used to impeach the credibility of a witness, and that it was not proper character evidence. Plaintiff's counsel responded that the evidence was offered to rebut Heinzinger's testimony "that GHC is a great company" and that Heinzinger is "proud of its reputation." The court overruled the objection and Heinzinger acknowledged the guilty plea.

Heinzinger's testimony on direct examination had been designed to show GHC's good character. Reputation, of course, is indirect evidence of character. The testimony concerning GHC's excellent reputation and "how well it treats people" placed GHC's character

in issue. It was an attempt to suggest to the jury that punitive damages would be inappropriate because GHC is a good company of honest, conscientious people. Consequently, plaintiff was entitled to introduce evidence of GHC's violation of a criminal statute involving dishonesty. *Cf. Williams v. McCoy*, 854 S.W.2d 545, 558 (Mo.App.1993) (where plaintiff, in an effort to imply he was of good character, testified that he was an elder in his church, defendant was permitted to ask plaintiff about his sexual conduct unbecoming a church leader). We need not address the admissibility of the mail fraud guilty plea for other purposes, since it was not an abuse of discretion to admit the evidence as rebuttal to plaintiff's character evidence. Thus, the trial court did not abuse its discretion in permitting Ryburn's counsel to inquire about the guilty plea. Point II is denied.

Judgment is affirmed.

All concur.