**Edsel POTTER, Respondent,**

v.

**MILBANK MANUFACTURING COMPANY, a Corporation, Appellant.**

**No. 55615.**

Supreme Court of Missouri, Division No. 1.

Dec. 11, 1972.

Opinion Modified on Court's Own Motion.

Motion for Rehearing or for Transfer to Court En Banc Denied Jan 8, 1973.

Walter R. Simpson, Robert Ernest Gould, Kansas City, for respondent; Sheridan, Sanders, Carr & White, Kansas City, of counsel.

George M. Winger, H. Fred Northcraft, Kansas City, for appellant; Smith, Schwegler, Swartzman & Winger, Kansas City, of counsel.

HIGGINS, Commissioner.

Action for actual and punitive damages for libel, Count I; for failure to comply with the service letter statute, Section 290.-140, V.A.M.S., Count II; and for slander, Count III. A verdict was directed for defendant on Count I; plaintiff had a verdict for $1.00 actual and $20,000 punitive damages on Count II, and for $1.00 actual and $5,000 punitive damages on Count III. Judgment was rendered accordingly, and defendant seeks to be relieved of the judgment of $25,002.

Count II of plaintiff's petition alleged: that plaintiff was employed by defendant from October 26, 1966, to February 14, 1968, when defendant arbitrarily discharged him; that plaintiff requested defendant to furnish him a service letter stating his length of employment, the true nature and quality of his work, and the true cause of his discharge; that in response to plaintiff's request defendant provided the following letter:

"Mr. Edsel Potter
"717 Ditman
"Kansas City, Missouri

"Dear Mr. Potter:

"RE: *Request For Service Letter*

"Receipt of your request for a service letter dated February 27, 1968 and received in our office on March 1, 1968 is hereby acknowledged.

"You were employed as a punch press operator by Milbank Manufacturing Company on October 26, 1966. You were later transferred, pursuant to your request, to sheetmetal worker Class A, and your employment was terminated by discharge on February 15, 1968. By letter dated February 2, 1968, a copy of which is enclosed herewith and incorporated by reference herein, the Company forwarded to you copies of its letters dated January 29, 1968 and January 30, 1968 to the United Steelworkers of America, the Union representing the employees in the plant, confirming the Union's agreement with the Company that an increment in your wage rate should be withheld.

"'for the reason that this employee is not satisfactorily and efficiently performing his work. This man is an exceptionally slow worker with many errors occurring which are adding to the production costs of products made within his department. As we discussed, this employee is also argumentative to all supervisors which prohibits us from giving additional in-

struction. Written and oral warnings have been issued to Potter by the Company on these matters.'

"It was agreed between the Company and the Union, as recited in the above letter, that until February 14, 1968 you would be given 'an opportunity to make a substantial improvement before his progress is re-evaluated and a final determination made.'

"At the end of the period set forth above, the Company made a final determination that your employment performance during the period in question did not vary materially from that described above and, accordingly, it discharged you.

"Yours very truly,

"MILBANK MANUFACTUR-ING COMPANY, INC.

"s/E. L. Harle, Plant Superintendent";

that said letter did not comply with section 290.140 in that defendant did not state the true nature and quality of services rendered by plaintiff nor did it truly state the cause of discharge; that, contrary to the letter, plaintiff was diligent and efficient, performing a satisfactory job with at least average speed and mistakes, and was not argumentative but was receptive to constructive criticism and suggestions; that, contrary to the letter, plaintiff was discharged for one or more or all of the following reasons: personality conflict with defendant's lead man due to no fault of plaintiff, lead man was desirous of plaintiff's job, personality conflict with defendant's foreman due to no fault of plaintiff, plaintiff became active in the union in an attempt to build a stronger local which defendant did not desire; that as a result of the false letter plaintiff was damaged; that defendant's acts were malicious. The prayer was for $30,000 actual and $25,000 punitive damages.

Count III alleged: that defendant's plant superintendent, E. L. Harle, in the presence of two employees of the Jackson County, Juvenile Court adoption department, and other employees at the plant, wantonly and maliciously spoke false, defamatory words, "that plaintiff was unable to perform his job and was not efficient and was constantly seeking out his supervisors for further direction which cut down on performance and output. That plaintiff did not get along with other employees. That plaintiff was a union radical. That plaintiff could not turn out good work. That plaintiff was highly irritable and that plaintiff was an insecure person"; that, as a result, plaintiff was damaged; that the slanderous statements were made wilfully and maliciously. The prayer was for $30,000 actual and $25,000 punitive damages.

Defendant's answer asserted that the service letter contained statements which it believed in good faith to be true, and that the statements made to the juvenile court workers were qualifiedly privileged.

Appellant contends on the sufficiency of plaintiff's case: I. There was no evidence to establish that the service letter did not state the true cause of plaintiff's discharge; II. There was no evidence to establish that statements made to juvenile court personnel were not true and, if made, were qualifiedly privileged; III. There was no evidence to support Instruction No. 7 on punitive damages for wrongful failure to issue a proper service letter; IV. There was no evidence of malice to justify submission by Instruction No. 12 of punitive damages for slander.

The following facts appear from the evidence favorable to plaintiff: Milbank Manufacturing Company of Kansas City, Missouri, makes meter boxes for electrical installations and has a net worth of $2,396,-481. Edsel Potter, born August 15, 1919, worked for Milbank from October 26, 1966, to April 1967, as a punch press operator, and from April, 1967, to February 15, 1968, in the specialty department as a sheet metalworker Class A. He had previously been employed for sixteen years by Koch Re-

frigerator Company as an assembler. He had also had experience as a sheet metalworker with Make-All, an assembler with Benson, and as a punch press operator with Rival. At the time of employment with Milbank he was known to be physically handicapped by a crippled leg.

T. O. Malone, plaintiff's foreman in the punch press department, described his work there as an exceptional job and he had no complaints about his work in that department. Plaintiff's transfer to the specialty department in April, 1967, came pursuant to a "bid" for such position and was accompanied by a pay increase. Plaintiff's work in the specialty department was the same as in the punch press department except that press operators in the specialty department read drawings and set their own dies and gauges.

Plaintiff was paid by the hour and had no piecework quotas. He received regularly scheduled wage increases until January 17, 1968, when an increase due that date was withheld. He was discharged February 15, 1968. Following his discharge, plaintiff made written request for a service letter and received the letter described in connection with the petition.

Prior to his discharge, and in October, 1967, plaintiff was elected plant union steward and, in that capacity, handled grievances against defendant for fellow employees until his discharge. During his stewardship a new union contract was under negotiation and he was consulted with respect to the contract by fellow employees. Upon complaints from fellow employees that the president and local union committee were failing to process grievances, plaintiff involved himself in an attempt to remove the local president, and the dispute was carried by plaintiff to the National Labor Relations Board.

Max L. Alexander, a fellow employee of plaintiff, was told by Norman Sams, lead man over plaintiff, that "he was going to go over and agitate Potter or try to cause trouble so he would either quit or get him fired." This occurred on several occasions after plaintiff began his union stewardship.

Also, during plaintiff's union stewardship, Mr. Malone requested John Mader, a fellow employee without any responsibility for plaintiff's work, to write a letter detailing any unacceptable aspects of plaintiff's work. Mr. Malone did not tell Mr. Mader why he wanted the letter, or that it would be placed in plaintiff's personnel file. Mr. Malone represented the letter would be kept confidential. After thinking about it for a week, Mr. Mader wrote the requested letter November 5, 1967, and Mr. Malone placed it in plaintiff's file. In eleven years at Milbank Mr. Mader had never received a similar request.

In his first thirty days in the specialty department, plaintiff was told by his foreman on one occasion that he took too much time to set up his machine and, on another, that he made a mistake. Both instances drew a form warning notice placed in plaintiff's file. Both were to be expected of a new man on the particular job.

There were no further complaints of plaintiff's work until November 15, 1967. On that date, and on December 4, 1967, and January 4, 1968, Mr. Malone placed additional warning notices in plaintiff's file. Plaintiff was not given a copy of any of these notices, and Mr. Malone had never placed a warning notice in any other employee's file without notifying the employee and giving him a copy of the notice.

On January 12, 1968, plaintiff received a written warning notice from Mr. Harle that there was no profit in some of his jobs. He was not shown any of the "cost cards" with respect to the complaint. Cost cards were another printed form used by Milbank to determine job costs. The card provided spaces for items produced, time spent, and rate of pay. Some employees did not keep such cards. Plaintiff gave Milbank his cost cards and in furnishing information "timed in" before he set up his machine and before he obtained his materials. He did not "time out" until job completion. Two

other specialty employees, Mr. Mader and Mr. Mince, did not time in until they had their machines set up, materials at hand, and ready to make their "run." Production costs would show higher for an operator who timed in prior to set up and obtaining materials for the run.

On January 19, 1968, Mr. Harle told plaintiff that his periodic wage increase due January 17, 1968, was being withheld because Milbank did not feel his work had progressed sufficiently. Plaintiff was asked to agree to the withholding of his increase and, when he refused, Mr. Harle told him the company was going to meet with the union with respect to such action as required by the union contract. Plaintiff was not advised by either the company or the union of the meeting time and place and he was not invited to attend. No one represented plaintiff at the meeting in support of his position that he was entitled to his pay increase. Plaintiff had no information with respect to the company's charges until he received a letter from Mr. Harle dated February 2, 1968. The letter enclosed copies of letters Mr. Harle and Mr. Malone had written to the union purporting to state the company's charges at the union meeting which he was now advised took place January 25, 1968.

At the union meeting Milbank presented for comparison cost cards of Mr. Potter and those of a fellow employee, Mr. Lewis. Cost cards are not kept for purposes of comparing one employee's production with that of another. Cost cards of the employee who preceded plaintiff on his machine were available but were not presented for such comparison. Mr. Lewis had been receiving help from Mr. Malone and from lead man, Shorty Sams. Mr. Lewis did not have to search for his dies and materials as did plaintiff, because they were kept at his machine, and Mr. Lewis did not work the same jobs as plaintiff. Mr. Lewis was not called by defendant as a witness at trial.

Mr. Malone and Mr. Harle also presented the warning notices from plaintiff's file but did not explain that they had been placed in the file without giving a copy to plaintiff. According to Harry Andrew, representative for United States Steelworkers of America, copies of such notices are normally given to the employee, and "a warning notice wouldn't be a warning notice if kept hidden out."

The letters mentioned in Mr. Harle's letter of February 2, 1968, to plaintiff were written to the union by Mr. Malone and Mr. Harle. Mr. Malone admitted that the statement in his letter that plaintiff had failed to show any evidence of improvement was untrue because plaintiff had shown improvement.

Milbank's position at the union meeting was that plaintiff should be given a trial period of 60 days in which to qualify for his wage increase; the union felt 30 days was sufficient. Milbank and the union then agreed to 30 days after which another meeting was to be held to further evaluate plaintiff's job performance in relation to his scheduled wage increase.

Plaintiff was told by Mr. Harle or Mr. Malone after the January 25, 1968, meeting that he had been given a 30-day trial period; but unbeknowst to him, Milbank started the trial period as of January 15, 1968. On February 15, 1968, plaintiff was fired without further union meeting for re-evaluation of his job performance. During the trial period plaintiff received no complaints about his work, and lead man Sams told him he was doing "pretty good." Neither Mr. Harle nor Mr. Malone talked with plaintiff or checked his work during this period. Mr. Harle had no complaint with respect to plaintiff's operation of his machine or speed of his work.

Plaintiff's performance in the punch press department during the six months preceding his promotion to the specialty department had been exceptional. His work habits and attitude toward superiors

were no different after his promotion. He received only the one warning slip for a mistake during the ten months he worked in the specialty department. Mr. Malone admitted that plaintiff was not argumentative all the time as represented in Mr. Harle's letter to the union and as quoted in the service letter. Plaintiff's rate of speed was the same in both punch press and specialty departments, and was the same as that of the other two men in the specialty department. As fellow employee Alexander saw it, "he would do his work like he was supposed to, what he was assigned to do for the day. He would put out what they wanted done."

Subsequent to plaintiff's discharge, Mr. Harle told two women from the juvenile court adoption department that plaintiff was discharged for "inability to perform his job or he wasn't performing his job efficiently," and that he was active in the union.

Despite his admittedly good record in the punch press department, plaintiff was discharged without offer of re-employment in that department and, since he was fired, he did not feel he had any right to "bid" for a return to that department. At the time of his discharge, plaintiff was earning $2.26 per hour. Following his discharge, he went to several firms offering his type of work but he was unable to find employment and was out of work for about a year and a half.

Without detailing defendant's evidence, suffice to say that the 4-volume transcript contains considerable evidence in conflict with that offered by plaintiff; but it is to be disregarded on this review except as to that which aids plaintiff. Roberts v. Emerson Electric Mfg. Co., Mo., 338 S.W.2d 62, 63–64[1, 2].

■ Plaintiff's case on failure of the service letter to correctly state the true cause of his termination, Count II, was submitted, as required, by MAI No. 23.08. Such instruction does not require an affirmative finding of the true reason for discharge. Accordingly, plaintiff has no burden of proving the true reason for his discharge; his burden is negative in character because such true reason is peculiarly within the knowledge of the employer, and burden of showing the truth of the asserted reason for discharge is on the employer. Kenton v. Massman Construction Co., Mo., 164 S.W.2d 349, 352[5]; MAI 23.08, Committee's Comment, p. 226.

The statement demonstrates evidence from which the jury reasonably could find that the true cause of plaintiff's discharge was his union activity. His troubles, if any, in the specialty department had gone virtually unnoticed for some six months following the beginning warnings until he became active in the union and even against some of its leadership; one of his superior set out to agitate him; and barely three months after commencing his union stewardship he was fired. The jury could further reasonably find from the evidence that the true cause of plaintiff's dismissal was not the reasons assigned in the indented paragraph of the service letter. A fair reading of the entire letter shows that the indented part was a direct quotation from Mr. Harle's letter of January 30, 1968, to the union, and was defendant's reason for withholding the periodic wage increase due January 15, 1968, rather than a reason for the subsequent discharge; and the failure to show a change could apply only to the short probationary period between January 15 and February 15, 1968. There was evidence also to show that plaintiff was performing satisfactorily and efficiently; that he was not exceptionally slow and error-prone, and that he was not chronically argumentative. This was true of his entire career at Milbank and was especially true of the probation period. Plaintiff's attitude and performance in the punch press department were concededly satisfactory and there was evidence to show his performance to be the same after promotion to the specialty department.

Appellant's argument with respect to Count II is based on a statement of the evidence which disparages plaintiff's evidence and emphasizes its own evidence, contrary to the rule. Roberts v. Emerson Electric, supra, 338 S.W.2d 1. c. 68[3, 4]. Appellant also asserts that Potter himself admitted that the reasons stated in the service letter "were true," and that he was bound thereby. In this latter respect, appellant makes several references to plaintiff's testimony that he "was given the feeling" that the company was not satisfied with his work, and that "they said as much"; however, none of such references rise to the dignity of judicial admission by plaintiff that defendant had stated the true reason for his discharge in the service letter or that such reasons were true. See Goggin v. Schoening, Mo.App., 199 S.W.2d 87, 92[2], and cf., Williams v. Kansas City Transit, Inc., Mo., 339 S.W.2d 792.

Considering the evidence stated, and without further detailing same, plaintiff made a submissible case on whether the service letter stated the true reason for his discharge because there is evidence from which the jury reasonably could find that he performed efficiently; that he was not an exceptionally slow, argumentative, error-prone worker during the trial period or at any time during his entire employment; and that he was fired for his union activity. See Roberts v. Emerson Electric, supra; Bourne v. Pratt & Whitney Aircraft Corp., Mo.App., 207 S.W.2d 533; Heuer v. John R. Thompson Co., Mo.App., 251 S.W.2d 980.

Appellant argues under Point II that since the same language is in issue under Count III, i. e., Potter was not efficiently performing his job, the facts and reasons set forth under Argument I are equally applicable, and that the statements made to the juvenile court employees were true and, in any event, qualifiedly privileged.

There is no question that Mr. Harle made the statements to the juvenile court employees as attributed to him in plaintiff's evidence; defendant has never questioned their defamatory nature; and, if false, they constitute slander per se because they tend to injure plaintiff in his employment by imputing to him a lack of fitness to perform his duties. Heitzeberg v. Von Hoffman Press, 340 Mo. 265, 100 S.W.2d 307, 309[2].

Plaintiff conceded the qualified privilege with respect to the alleged slander by inclusion in Instruction No. 9, submitting Count III, of a required finding "that such statement was made knowing it to be false or without knowing it was true or false in reckless disregard for the plaintiff's rights * * *," as required by MAI No. 23.10 and Notes on Use, MAI, p. 230. In such a case both falsity and malice must be shown, Pulliam v. Bond, Mo., 406 S.W.2d 635, 641[7]; and proof of falsity of the statement(s) and knowledge of such falsity is proof of actual malice because that shows, unquestionably, a wrong motive, Estes v. Lawton-Byrne-Bruner Ins. Agency Co., Mo.App., 437 S.W. 2d 685, 692.

It already has been demonstrated under Point I that there was evidence from which the jury reasonably could find, and it did find that plaintiff performed his job efficiently, leaving the question whether Mr. Harle, who made the statements to the juvenile court workers, knew his statements to that effect were false, or whether he did not know them to be true or false and made them in reckless disregard for plaintiff's rights.

Mr. Harle testified that he did not follow plaintiff's progress in the specialty department and made no special effort to acquaint himself with plaintiff's work. He seldom spoke to plaintiff and knew of but one instance when plaintiff had trouble with his machine. He had no complaints of plaintiff's operation or speed. From such evidence the jury reasonably could find that Mr. Harle did not know whether plaintiff was efficient in performance of his job. And from such evidence, taken with the evidence tending to show that Mr. Harle

actually fired plaintiff because of union activities rather than the reasons stated for his discharge, the jury reasonably could find that Mr. Harle knew his statement to be false and that he was motivated by actual malice or that he recklessly disregarded plaintiff's rights.

■ Appellant's Points III and IV assert error in submitting punitive damages on Count II by Instruction 7 and on Count III by Instruction 12. Appellant does not question the accuracy of Instructions 7 and 12, and they are taken from MAI No. 10.01, requiring a finding that defendant's conduct was "willful, wanton, or malicious" in order to award punitive damages, and MAI No. 16.01 defining legal malice as "the doing of a wrongful act intentionally without just cause or excuse."

Appellant's argument on these points is again based on the assertion that Potter admitted that Milbank thought the reasons for discharge given in the letter and the statements to the court workers were true and, hence, no malice and no punitive damages. The lack of judicial admission in plaintiff's testimony has been demonstrated under Point I.

There is no question that submission of punitive damages on legal malice is proper in both service letter cases, Roberts v. Emerson Electric, supra, 338 S.W.2d 1. c. 71, Booth v. Quality Dairy Co., Mo.App., 393 S.W.2d 845, and in slander cases, Trice v. Lancaster, Mo.App., 270 S.W.2d 519.

The evidence warranting the jury to find that the service letter did not state the true cause of plaintiff's discharge warranted also the submission of legal malice on Count II; and the evidence warranting the jury to find that Mr. Harle knowingly made a slanderous statement concerning plaintiff to the juvenile court workers warranted also the submission of legal malice on Count III.

Reference to certain instances shown by the evidence and to the full statement demonstrates that defendant through its superintendent, Mr. Harle, was motivated by actual malice in writing the service letter and in making the statements to the juvenile court workers. Plaintiff's personnel file was loaded with warnings of which he had no notice; plaintiff's lead man asserted several times he was going to agitate him and get him fired; plaintiff's foreman obtained a letter of unsatisfactory performance from a fellow worker; and the foreman admitted a false statement concerning plaintiff in his letter to the union; plaintiff was not advised of, or represented at, the union meeting held to consider the wage increase withheld from him; no promised re-evaluation meeting was held; his work record at Milbank beginning October, 1966, was free of complaints other than those to be expected until November, 1967, when he became active in the union. From such evidence the jury reasonably could find that defendant committed wrongful acts intentionally without just cause or excuse.

■ Appellant charges the court with error also in refusing to permit Wayne F. Caskey, Jr., to testify that in his capacity as a former attorney for Milbank, he had been consulted by Milbank and had, in good faith, written the service letter to Potter.

Appellant's argument is that in the circumstances of this case, Mr. Caskey, even though an attorney, was competent to testify except as to privileged communications and his testifying would not constitute unethical conduct. See Anno. 118 ALR 954, Impropriety of Attorney Testifying for Client as Ground for Exclusion of Testimony Otherwise Admissible.

A trial court has broad discretion with respect to all evidentiary matters, Dickerson v. St. Louis Public Service Co., 365 Mo., 738, 286 S.W.2d 820, 827; and, assuming it was proper for Mr. Caskey as a lawyer for defendant to testify, the context in which the offer was made shows that the court did not abuse such discretion. The jury was told by Mr. Winger in opening statement that Milbank had sought legal advice concerning the letter written to the union and

the service letter; appellant's offer of proof through Mr. Caskey was that in March, 1968, he was employed by Smith, Schwegler, Schwartzman, and Winger; that he received from Milbank a request for advice with respect to plaintiff's request for a service letter; that he advised Milbank of its obligation to furnish such letter and he wrote the letter. Mr. Harle had previously testified in this respect in response to questions put to him by Mr. Winger that he had sought legal counsel when he received plaintiff's request for a service letter; that he spoke to Mr. Caskey who was then associated with Mr. Winger's firm; that thereafter the letter was furnished to Mr. Potter. Mr. Harle then identified the letter, written on company stationery over his signature, and testified further that he did not personally write the letter; that it was prepared after consultation with counsel and was written after legal advice.

Thus, it appears that Mr. Harle testified to the entire substance of evidence mentioned in appellant's opening statement and the offer of proof. In such circumstances, Mr. Caskey's testimony would have been cumulative and "exclusion of evidence is harmless where the same facts are shown by other evidence." Long v. Hooker, Mo., 443 S.W.2d 178, 181[4]. It should be noted also that Mr. Caskey's "good faith" in writing the letter to Potter is not at issue.

■ Appellant's next complaint is of the court's failure to give defendant's offered converse Instruction No. 16, that the jury's verdict "must be for defendant on Count II if you believe that the defendant believed the reasons set forth in its letter of March 7, 1968 were the true cause of plaintiff's discharge."

At defendant's request the court gave converse Instruction No. 5 that the jury's verdict "must be for defendant on Count II unless you believe that defendant's letter of March 7, 1968 did not correctly state the true cause of plaintiff's termination."

■ Defendant's agent, Mr. Harle, issued the letter on behalf of his corporation. His beliefs in preparing the service letter, however honest and reasonable, are irrelevant on the issue of his corporation's liability, Roberts v. Emerson Electric Mfg. Co., supra, 338 S.W.2d 1. c. 71–72; and given Instruction No. 5 is in the form prescribed by MAI 33.13. Under such authorities, offered Instruction No. 16 was not proper and Instruction No. 5 was proper. Accordingly, it was not error for the court to refuse No. 16 and to give No. 5.

■ Appellant contends finally that the court erred in refusing to order a remittitur. The argument is that the court has authority to remit part or all of the punitive damages awarded in Counts II and III; that the highest award for punitive damages on a service letter count is $5,000 in 1966; that Potter made no showing of injury or malice, and the awards on both counts are grossly excessive. Appellant then "submits an abuse of discretion has occurred."

"Punitive damages are awarded for the purpose of inflicting punishment for wrongdoing, and as an example and deterrent to similar conduct," Beggs v. Universal C. I. T. Credit Corp., Mo., 409 S.W.2d 719, 724[8]; and this record does not convict the trial court of an abuse of discretion in refusing remittitur for any of the suggested reasons.

Of course, the trial court had the discretion to reduce the judgment, and this court is authorized to review the trial court's ruling to determine whether such was an abuse of discretion. An award of punitive damages need not be reduced solely because no other award has reached the same figure; something else should be demonstrated as a basis for finding an abuse of discretion in failure to require remittitur, because the matter of punitive damages "is so purely and peculiarly one for the jury's discretion that regardless of what the character of the action may be * * *, it is only in an extreme case that an appellate court will

undertake to revise such an award." La-Chance v. National Pigments & Chemical Co., Mo.App., 104 S.W.2d 693, 701[19].

There can be no question that plaintiff showed injury. With respect to Count II, it was not necessary for him to prove actual damages in order to be entitled to a verdict for $1.00 nominal damages. "The failure to give a proper service letter constituted an invasion of plaintiff's legal rights and without proof of any damages whatever entitled plaintiff to a verdict for nominal damages." Heuer v. John R. Thompson, supra, 251 S.W.2d 1. c. 985[2–4]. And, under Count III, actual injury to plaintiff was shown by the *per se* slanderous statements made by defendant concerning plaintiff to two juvenile court adoption caseworkers. In a service letter case, "punitive damages may be assessed though the recovery of actual damages be only nominal * * *," Heuer v. John R. Thompson, supra, 1. c. 985[5], and it already has been demonstrated that plaintiff made the necessary showing to justify submission of malice as a prerequisite to an award of punitive damages on that count as well as on Count III.

With respect to Count III, who, better than a jury can determine the amount of actual damage occasioned by the *per se* slanderous statements made by defendant to the adoption caseworkers, and who can say that its award of $5,000 is excessive punitive damages to be assessed against the party who so injured plaintiff through its malice?

■ Defendant's net worth was shown to be $2,396,481, and the combined judgment is only slightly more than one per cent of that figure. In Gerharter v. Mitchellhill Seed Co., Mo.App., 157 S.W.2d 577, a judgment for punitive damages on a service letter action alone was upheld which represented approximately one and one-half per cent of defendant's net worth, and in Walker v. St. Joseph Belt R. Co., Mo.App., 102 S.W.2d 718, a punitive damage award in a service letter action alone was upheld which represented approximate-

ly one and one-fourth per cent of defendant's net worth. In Beggs v. Universal C.I.T., supra, this court did order a remittitur on the ground there was nothing to show defendant guilty of wrongdoing. By contrast, it has been demonstrated that in this case the evidence warranted submissions and findings that defendant was motivated by wrongdoing; and there is no showing that the jury's award of punitive damages was caused by "improper motives or a clear absence of the honest exercise of judgment", Beggs v. CIT, supra, 409 S.W.2d 724[10]. See also Hoene v. Associated Dry Goods Corp., Mo., 487 S.W.2d 479.

Judgment affirmed.

WELBORN, C., concurs.

PER CURIAM:

The foregoing opinion by HIGGINS, C., is adopted as the opinion of the Court.

All of the Judges concur.