**Kenneth E. EIMER, Appellee,**

v.

**TEXACO, INC., a corporation, Appellant.**

No. 74–1654.

United States Court of Appeals, Eighth Circuit.

Submitted Feb. 13, 1975.

Decided June 13, 1975.

Rehearing and Rehearing En Banc Denied July 3, 1975.

Ralph C. Kleinschmidt, St. Louis, Mo., for appellant.

Ross G. Lavin, St. Louis, Mo., for appellee.

Before BRIGHT, ROSS and STEPHENSON, Circuit Judges.

STEPHENSON, Circuit Judge.

This appeal concerns the application of V.A.M.S. 290.140, the Missouri "service letter" statute, which requires a corporation employer to furnish a terminated employee, upon request, a letter stating the true reason for his or her discharge.[1]

---

1. 290.140. *Letter of dismissal, when—failure, misdemeanor*

Whenever any employee of any corporation doing business in this state shall be discharged or voluntarily quit the service of such corpora-

tion, it shall be the duty of the superintendent or manager of said corporation, upon the written request of such employee to him, if such employee shall have been in the service of said corporation for a period of at least ninety

The only question before us is whether the plaintiff satisfied his burden of proof in the instant case by presenting evidence from which the jury could reasonably conclude that Texaco did not discharge Eimer for the reason given in his service letter. We affirm the district court's determination [2] that a submissible issue was created.

Appellant Eimer initially brought this action in Missouri state court in two counts, claiming actual and punitive damages from Texaco in Count I for defamation and in Count II for a violation of V.A.M.S. 290.140. After removal to federal court, the action was tried to a jury. A verdict and judgment for Texaco was entered on the defamation count. The jury found for the plaintiff on the service letter count and awarded him $1 in actual damages and $25,000 in punitive damages. This appeal followed that award.

The facts in this case are undisputed. In 1971 Kenneth Eimer, an engineer with Texaco since 1968, was given the position of superintendent of construction and project engineer for a project at Texaco's St. Louis bulk plant terminal and storage facility on the Mississippi River. Eimer was charged with a broad range of job responsibilities relating to the supervision of construction and renovation of facilities at the Texaco site in preparation for a tie-in with an interstate pipeline fuel transmission system. These construction efforts, and Eimer's role as overseer, were complicated by the fact that the terminal was in continuous use as a fuel storage facility for gasoline throughout the building period.

On December 20, 1971, a gasoline spill, later calculated at 169,000 gallons, was discovered to have taken place at the terminal following a fuel delivery by barge. The spill occurred because an eight foot section of pipe leading to a storage tank had been removed by one of the subcontractors involved in the construction project, but the open end of the pipe had not been capped or plugged. Investigation of the incident ensued, and within a few weeks after the spill five Texaco employees were disciplined.

Four men in the operations department were issued letters of reprimand and suspended for one or two weeks because they failed to inspect the pipeline as required by Texaco regulations prior to unloading the fuel from the barge and because they failed to follow the proper procedures once they learned of the spill. The fifth, appellee Kenneth Eimer, was discharged following the spill.

Shortly thereafter, Eimer, pursuant to the statute, requested a service letter from Texaco "setting forth * * * the cause of my discharge." In response to that letter, Texaco stated in part as follows:

On January 31, 1972 you were discharged as a result of our conclusion that you were negligent in the performance of your duties on or about December 20, 1971 which contributed to the loss of approximately 169,007 gallons of gasoline.

\* \* \* \* \* \*

It was your responsibility to physically inspect all construction work in progress at the St. Louis Terminal, to be completely advised of the status of the construction work, to take precautions necessary and initiate corrective measures as soon as you became aware of the fact that the pipe line was cut but unplugged. You failed to discharge these responsibilities.

---

days, to issue to such employee a letter, duly signed by such superintendent or manager, setting forth the nature and character of service rendered by such employee to such corporation and the duration thereof, and truly stating for what cause, if any, such employee has quit such service; and if any such superintendent or manager shall fail or refuse to issue such letter to such employee when so request-

ed by such employee, such superintendent or manager shall be deemed guilty of a misdemeanor, \* \*\* \*.

2. The Honorable James H. Meredith, Chief Judge, Eastern District of Missouri, denied appellant's motion for judgment in accordance with its motion for a directed verdict or for a new trial.

Your failure to discharge these duties contributed to the creation of a dangerous situation and the loss of the gasoline which represented a substantial investment to the company.

In the district court Eimer contended that this service letter did not state the true reason for his discharge as required by the statute. In support of this allegation, he introduced evidence at his trial that suggested a number ·of alternative reasons for his firing and offered evidence from which the jury could infer that the reason set out in the service letter was false. He testified that in early 1971 he had been offered a transfer and promotion by Texaco to their New York headquarters. Following his refusal to accept this offer, Texaco officials expressed displeasure with his decision and asked him to detail the reasons that brought about his conclusion. Eimer also testified that on the day after the spill was discovered, he had driven from St. Louis to Jefferson City to take the second part of the professional engineer's examination. Even though he had secured permission from Texaco to take the day-long test far in advance, his superiors called him shortly after his arrival in Jefferson City and requested that he return at once in order to make a statement regarding the spill. His refusal to do so was offered by Eimer as another possible explanation for his discharge.

In addition, Eimer pointed out that he had the shortest tenure with Texaco of any of the five people involved with the spill. Finally, evidence was introduced that Texaco claimed damages for the gasoline loss and the cleaning-up costs from the independent piping contractor in charge of the project. A cash settlement was paid to Texaco by the contractor's insurance company prior to this trial.[3] Eimer argued that this claim against the contractor proved that he was not fired by Texaco on account of his role in the gasoline spill. Rather, he contended that any or all of the alternative causes he presented could well have been the true reason for his discharge by Texaco.

Texaco maintained in the district court that Eimer was discharged as a direct result of his negligence which contributed to the gasoline spill. Much reliance was placed upon the statement made by Eimer to Texaco officials shortly after the spill in which he stated that all persons connected with the spill, including himself, were partially responsible. Even though Eimer later denied any responsibility on his part and alleged that he made this statement only to protect the operations personnel, whom he thought were completely at fault, counsel for Texaco argued to the jury that this statement was an admission that proved the reasonableness of Texaco's conclusion that Eimer was negligent and the truthfulness of the service letter.

In this court Texaco contends that the possible reasons advanced by Eimer at trial for his discharge were inadequate to satisfy his burden of proving that the reason stated in the service letter was false. Texaco further asserts that this evidence failed to prove that the real reason for Eimer's discharge was anything other than that stated in the service letter. We disagree with appellant's conclusion as to the inadequacy of Eimer's evidence and reject the suggestion that the plaintiff in a Missouri service letter case has the burden of proving the true reason for his discharge.

█ It is clear that in a case brought under the Missouri service letter statute the plaintiff has the burden of proving that the stated reason for his discharge is false. It is undisputed in the instant case that the jury was properly instructed as to this burden. In *Potter v. Milbank Manufacturing Co.,* 489 S.W.2d 197 (Mo.1972), the Missouri Supreme Court analyzed the burdens of proof in a service letter case, The court noted initially that the standard instruction given in that case, which was also given here,

---

**3.** Texaco computed its damages from the spill amount paid to Texaco was $3,500. as in excess of $30,000. The settlement

does not require the jury to make an affirmative finding of the actual reason for discharge. From this the Missouri court concluded:

Accordingly, plaintiff has no burden of proving the true reason for his discharge; his burden is negative in character because such true reason is *peculiarly within the knowledge of the employer, and [the] burden of showing the truth of the asserted reason for discharge is on the employer.*

*Id.* at 203 (emphasis added).

■ We find the *Potter* case dispositive here. Our only inquiry is whether the plaintiff's evidence, viewed in the light most favorable to him, provided a basis upon which the jury could reasonably conclude that Eimer's role in the gasoline spill was not the true reason for his discharge. *See Howe v. St. Louis Union Trust Co.,* 392 S.W.2d 625, 629–30 (Mo.1965); Roberts v. Emerson Electric Mfg. Co., 338 S.W.2d 62, 63–64 (Mo. 1960). Given this strictly limited standard of review and the variety of evidence presented by Eimer that suggested possible reasons for his discharge apart from his involvement in the gasoline spill incident, we hold that a submissible issue was created for the jury in this case.

We also reject Texaco's contention that, at a minimum, Eimer needed to present evidence that the determination by Texaco that he was negligent was so lacking in factual support that reasonable minds could not have reached the same conclusion. Whether or not the facts in this case, coupled with Eimer's "admission" of negligence, made Texaco's conclusion reasonable is not determinative of the issue in dispute. The jury was properly instructed that this was not an action based upon wrongful discharge. The critical issue for the jury to determine was whether Texaco lived up to its statutory obligation to furnish Eimer with the true reason for his discharge. The jury found it did not. Were we triers of the facts, we may have reached a contrary conclusion.

However, on this record we cannot say as a matter of law that the jury erred.

Affirmed.

BRIGHT, Circuit Judge (concurring):

In affirming this award, I in no way intend any approval of the wisdom of the "service letter" statute or of its construction by the Missouri courts. As construed by the Missouri courts, the statute in this case enables a discharged employee to merely present evidence to a jury disputing the reasons given him for discharge by his employer and, thereby, in effect, permit a jury to award actual and punitive damages for a job ill-performed by the employee.

Here the jury passed upon an issue of fact properly tendered to it. While this court may not agree with the jury award, our review function does not permit us to set aside an award which is supported by substantial, but disputed, evidence.

ROSS, Circuit Judge (dissenting).

While I agree with the majority's reliance upon *Potter v. Milbank Manufacturing Co.,* 489 S.W.2d 197 (Mo.1972), and with its statement of the standard of review to be utilized here, I disagree with the conclusion that the jury's verdict was supported by sufficient evidence. Eimer offered four possible alternative reasons for his discharge, but the evidence on each one is so weak that only through sheer speculation could it be concluded that any of them might be the true reason.

Eimer's refusal to accept a promotion to Texaco's New York headquarters occurred many months before he was fired. And Eimer himself testified that he was not aware of any repercussions resulting from this refusal. In fact, *after* this refusal Eimer was given a promotion and salary increase in St. Louis. It is inconceivable that his decision to remain in St. Louis was a "true reason" for his discharge after the spill.

When Eimer "refused" to return to St. Louis from Jefferson City on the day

after the spill he was not, in fact, refusing any company order since his immediate superior called him in Jefferson City and told him that it would be all right to return the following day. One company official did express his displeasure at the delay to Eimer; but that official had no authority to fire Eimer, and his uncontradicted testimony is that he did not recommend that Eimer be discharged, but only that he be suspended for two weeks and given a letter of reprimand. There is, therefore, absolutely no evidence from which to conclude that Eimer's remaining in Jefferson City overnight to take the professional engineer's examination was a reason for his discharge.

The fact that Eimer received the most stringent penalty and was the most junior of the company employees who were disciplined because of the spill establishes nothing in the context of this case. There is no evidence to show that Texaco routinely punishes junior employees more harshly for their mistakes. Eimer admitted in his statement to the officials investigating the spill that he, along with others, was responsible for it. And he was in overall charge of the construction project. It is pure speculation to tie Eimer's discharge to his lack of seniority among those disciplined.

Finally, the fact that Texaco made a claim for damages from the independent piping contractor does not even remotely suggest that it did not also consider Eimer negligent and responsible for the spill. There simply is no connection between Texaco's claim against the contractor and a conclusion that it did not fire Eimer because of his part in the accident.

This Court should be hesitant to overturn a jury's finding of fact, but I am convinced that the paucity of probative evidence in this case mandates such a result. I am convinced that the only logical determination that the jury could have made based upon the evidence presented to it was that Eimer was fired for exactly the reason stated in the letter.