Vernon L. **WUERDERMAN,**
Plaintiff-Respondent,

v.

**J. O. LIVELY CONSTRUCTION CO.,**
Defendant-Appellant.

No. 11112.

Missouri Court of Appeals,
Southern District,
Division Two.

June 27, 1980.

Benjamin J. Francka, Springfield, for plaintiff-respondent.

James W. Newberry, Schroff, Keeter, Glass & Newberry, Springfield, for defendant-appellant.

MAUS, Judge.

By his amended petition the plaintiff sought to recover against his former employer upon four counts. Court I was based upon the employer's alleged failure to issue a service letter as required by § 290.140, RSMo. Count II alleged the breach of a contract for employment for one year. Count III alleged the breach of a contract for subsistence pay. Count IV was based upon an allegedly libelous statement made by the employer to the Kansas Employment Security Division. At the close of the plaintiff's evidence, the trial court sustained the defendant's motion for a directed verdict upon Counts II and III. At the close of all the evidence the trial court sustained the defendant's motion for a directed verdict upon Count IV. Count I (service letter) was submitted to the jury which returned a verdict for the plaintiff for $1.00 for actual damages and $27,500.00 for punitive damages. The defendant appeals.

The defendant's business includes the construction of coal handling facilities. Its headquarters is in Glen White, West Virginia. In June of 1975 the defendant was constructing coal handling facilities for the Southwest Power Plant in Springfield. The plaintiff, who was 50 years old at the time of trial, had been a carpenter and millwright since 1948. Dale Short, business representative for Carpenters Local 978 of Springfield, called the plaintiff to see if he wanted a job on the Springfield project as millwright foreman at $9.46 per hour. Although employed at the time, the plaintiff decided to take the job and came to Springfield. He was hired as millwright foreman by Elmer Gibson who was the defendant's job superintendent for the Springfield project. He worked from June 23, 1975, to October 10, 1975, when he was terminated.

There was a conflict in the evidence concerning the manner in which the plaintiff was terminated. Gibson testified that on October 10, 1975, he decided to terminate the plaintiff; he signed a termination slip and gave it to timekeeper Eller with directions to prepare plaintiff's checks and give the checks and slip to the plaintiff. Eller testified he did so and when the plaintiff asked the reason he stated "it's [on] there," referring to the termination slip. The form of a company termination slip was in evidence and that form contains a blank for the reason for the termination. Gibson and Eller testified that only one copy of the termination slip was prepared. However, Eller testified that when Gibson gave him the slip he said, "Be sure and give him that copy." A completed copy was not produced. Neither Gibson nor Eller testified what reason was given on the slip handed to the plaintiff. On the other hand, the plaintiff testified he was not given a termination slip, but only handed two checks. Because he received two checks he knew he was terminated and when he asked Eller "what's the deal?", Eller replied he had no idea.

There was also a conflict in the testimony concerning the reason for the plaintiff's termination. It is apparent that by the end of September progress on the project was delayed. On October 7, 1975, the engineer who was responsible for the drawings as well as the progress of the project, told

Gibson the millwright work was the biggest holdup and it was impossible to go on. The defendant's witnesses attributed the holdup to the plaintiff's lack of supervision, his inability to follow blueprints, and his lack of coordination of tools and materials. Gibson stated he had discussed plaintiff's shortcomings with him on numerous occasions and twice had complained of those shortcomings to the union business representative. On the other hand, the plaintiff attributed the delay to inadequate plans, changes in the plans, and lack of proper tools and materials on the job site. He said that he had discussed these problems with Gibson to no avail. Gibson admitted that plaintiff did complain to him about inadequate materials and tools. Plaintiff denied that Gibson ever complained to him about the plaintiff's work. The plaintiff produced a "Trip Report" of the executive vice president and general manager of the defendant concerning an on-site inspection made September 24 and 25, 1975, in association with Gibson and Eller. The report details several irregularities in plans and materials and refers to a delay because of the work of another contractor. There is no reference in the report of any deficiency in the work of the plaintiff. The union business representative testified that Gibson did not complain to him of plaintiff's work, and that after the plaintiff was terminated upon inquiry, Gibson told him the plaintiff just didn't have it.

After termination, the plaintiff sought employment elsewhere. He was not employed until March, 1976, and subsequent to his termination he has not been employed as a millwright foreman. No prospective employer asked him for a service letter, but he said if he had such a letter he would have supplied it.

The plaintiff testified that on November 24, 1975, he wrote the defendant a letter, addressed to its headquarters, outlining his employment history with the defendant, the problems he encountered, his termination without explanation and expressing his interest in further work for the defendant. The vice president and treasurer of defendant denied this letter was received. In January, 1976, the plaintiff wrote the letter which gives rise to the present controversy. After a heading giving the plaintiff's name and address, the inside address was: "J. O. Lively Const. Co., Glen White, West Virginia 25849". The salutation was: "Dear Sir". The body read: "It is required by Missouri law 290.140 R.S.M.O. upon written request, which I am doing at this time, for your company to give reason for my termination." It was signed "Thank you, Vernon Wuerderman". The envelope, similarly addressed was postmarked January 16, 1976. It was received by the plaintiff on January 19, 1976.

The evidence concerning the receipt and handling of this letter by the defendant came from Arnold Graybeal. Graybeal had been vice president and treasurer of the defendant since 1969. He was responsible for all accounting functions. The personnel files were maintained in his office and under his supervision. He was in charge of those files as they related to payroll and he testified "we take care of clerical functions". Correspondence to the company relating to employees was referred to the payroll department. Miss Georgia Daniels was a payroll clerk working under the supervision of Graybeal.

In November, 1975, the defendant received a notice from the Employment Security Division of Kansas that the plaintiff had made a claim for unemployment benefits. The form stated the plaintiff gave as the reason for his termination: "Laid off—Lack of Work". The form indicated that if the defendant wanted to protest the claim it should complete the "Employer Reply" and return the form. After a call to Gibson, the employer reply was completed giving as the correct reason for the termination, "Let go—unable to do the job required of him". The reply was dated November 5, 1975, and signed on behalf of the defendant by G. Daniels. A second notice from the Employment Security Division was received by the defendant and again the reply was completed giving as the correct reason for the separation, "Let go—unable to do the job required of him". The second reply was

dated January 21, 1976, and again signed on behalf of the defendant by G. Daniels.

The plaintiff's letter in question was signed for on behalf of the defendant by a draftsman. However, it was then delivered to Miss Daniels. Graybeal testified that Miss Daniels reviewed with him the Kansas form and plaintiff's letter at the same time. He gave her directions concerning what was to be done in respect to the two documents. On direct he said, he did not answer plaintiff's letter because he thought the letter was concerning the unemployment benefits, "since we had received another unemployment form, it appeared that he was disturbed because he hadn't drawn his unemployment benefits, and since we returned the new unemployment form about the same time, I thought that was all that was required." He further said he had never encountered a service letter statute and did not become aware of the Missouri service letter statute until the suit was filed. On cross-examination, he stated he called a "local attorney" and asked if he was aware of any requirement to write a letter and explained about the unemployment forms and that they thought that was all that was required. He did not state what the attorney told him, but that thereafter he placed the plaintiff's letter in his personnel file. The present action was filed on May 26, 1976, and the suit papers did pass over Graybeal's desk. They were referred to the company attorneys. No service letter was ever written by the defendant.

■ While not expressly stated in the defendant's points relied upon, an underlying argument of the defendant is that Graybeal was not a person to whom a request for a service letter could be made within the meaning of § 290.140. The part of § 290.140 pertinent to this question reads: "[I]t shall be the duty of *the* superintendent *or* manager of said corporation, upon the written request of such employee to him, . . . to issue to such employee a letter, duly signed by such superintendent or manager, . . . ." (emphasis added) The statute further provides that upon a failure to issue a required letter the super-

intendent or manager shall be guilty of a misdemeanor. While the statute is worded as if the issuance of a service letter was the personal duty of the superintendent or manager, it has not been so construed. Considering the remedial aspect of the statute, it has been construed "to give an employee, wrongfully refused a letter, a right of action against his corporate master and to make it the duty of the corporation acting through its superintendent or manager to issue the letter and not the duty of the superintendent or manager in his individual capacity." *State ex rel. Terminal R. R. Ass'n of St. Louis v. Hughes,* 350 Mo. 869, 874, 169 S.W.2d 328, 330 (1943). A literal construction of the statute referring to the superintendent or the manager of said corporation would refer to the one person who has charge of all the activities of the corporation. *Turner v. Emerson Electric Manufacturing Company,* 280 S.W.2d 474 (Mo. App.1955). The inappropriateness of such a construction is demonstrated by visualizing the position of the superintendent or the manager of General Motors or Ford. The statute has not been so narrowly construed. In view of the corporate duty to issue the letter, it would seem the purpose to be served by the individual designation is to provide that the written request be made to and answered by one who has managerial powers in respect to the employee in question or is otherwise authorized to act on behalf of the corporation in regard to that request. The terms superintendent or manager have been held to include "one who has general supervision of all of the activities of the corporation" or "one who performs the duties of a superintendent or manager as to the work, or the department, in which the employee is engaged," *Turner v. Emerson Electric Manufacturing Company,* supra, 280 S.W.2d at 478–479, or one who has "supervising control or management over the ushers". *Chrisman v. Terminal R. Ass'n of St. Louis,* 237 Mo.App. 181, 191, 157 S.W.2d 230, 234 (1942). The terms have also been said to include "its superintendent or manager *or* other officer or employee competent therefor within the contemplation of the statute," *Lyons v. St.*

**220**

*Joseph Belt Ry. Co.*, 232 Mo.App. 575, 587, 84 S.W.2d 933, 941 (1935) and "[l]ikewise, it is sufficient to make the request of one to whom supervisory and managerial functions are entrusted by the corporation in connection with employment and personnel matters directly affecting and who actually exercises supervisory and managerial control over the particular employee who desires the service letter". *Turner v. Emerson Electric Manufacturing Company*, supra, at p. 479. There seems to be little doubt but what the terms have been and should be construed to include, as expressed in the comment to MAI 23.08, a person who may have "corporate authority to write service letters".

That corporate authority need not be established by express corporate resolution, but may be otherwise inferred. 2 Fletcher Cyclopedia Corporations, § 444, pp. 329–332. Graybeal was a corporate officer, vice president and treasurer. The personnel files were maintained under his direction and his office took care of clerical functions relating to those files. Incoming correspondence relating to employees was referred to his department. He exercised his authority in giving the employer's reply upon the forms from the division of employment security. He also acted for the corporation in inquiring of an attorney concerning the plaintiff's letter and determining not to respond to that letter. If Graybeal's authority is not affirmatively established by these circumstances, it is significant that neither by pleading nor by testimony did the defendant question the authority of Graybeal to deal with the request for a service letter. The authority of admitted corporate officer and agent Graybeal might well be deemed established by the proposition that "where it appears that an agent has done an act for the benefit of his principal and that the latter has not questioned the authority of the agent to bind him, it will be presumed, until the contrary appears, that the agent was duly authorized." 3 Am.Jur.2d Agency § 350, pp. 707–708.

Moreover, in this case the defendant had knowledge of the request for four months before service of process was had and for almost two years before trial. " 'Under the circumstances of this case that is a reasonable time in which to disown the act of the officers, even if such act was not fully authorized. This delay upon the part of the corporation amounts to acquiescing in and ratifying the unauthorized contract.' " *Josephine Hospital Corporation v. Modoc Realty Co.*, 307 Mo. 336, 351, 270 S.W. 638, 642 (1925). Under the facts of this case the defendant cannot successfully challenge the authority of Graybeal to deal with the request for a service letter, to answer it or to determine not to answer it.

Under the first point the defendant asserts that plaintiff's request for a service letter is defective because it was not addressed to a specifically named person. In making that argument the defendant emphasizes the amendment to the statute in 1941 adding the words "to him". While it is certainly the better practice to address a written request to a specific person having the requisite capacity, to find that to be mandatory is not in keeping with the remedial aspect of the statute. *State ex rel. Terminal R. R. Ass'n of St. Louis v. Hughes*, supra. The request was in writing and it did in fact come to Graybeal for action. It is not vital how it reached him. It was a request to him just as much as if the plaintiff had handed that written request to him.

The defendant's next point is that the plaintiff's Instruction No. 2 submitted by the plaintiff was an improper deviation from MAI 23.08. Paragraph Second of MAI 23.08 reads: "[A]fter his employment was terminated the plaintiff made a written request to the superintendent [manager][1] of the defendant for a letter of dismissal." The Committee's Comment 1. reads: "If corporation does not have such a titled officer then statute includes such title

or person as may have general supervision or corporate authority to write service letters and the title (or name) as shown in evidence should be substituted." The defendant contends that since the defendant had job superintendent Gibson, the instruction tendered by the plaintiff submitting "a written request to the Vice President-Treasurer of the defendant" is a prejudicial deviation. It is significant the direction referred to is not contained in the "Notes on Use", *Corbin v. Wennerberg*, 459 S.W.2d 505 (Mo.App.1970); *Matter of Estate of Passman*, 537 S.W.2d 380 (Mo. banc 1976). In view of the consistent construction of the statute as authorizing the written request to be made to alternate persons or titles, this court does not find the instruction in question to be a deviation. If it be considered such, since the instruction clearly referred to *Graybeal, Hudson v. Kansas City Rys. Co.*, 246 S.W. 576 (Mo.1922), a person held to have corporate authority to answer the request, it clearly is not prejudicial.

■ The defendant's next point is that the trial court erred in admitting evidence regarding statements made by the defendant upon the unemployment form, in refusing to direct a verdict against the plaintiff on the libel count at the close of his evidence, and in refusing an instruction withdrawing those statements. The defendant then argues that had a verdict been so directed, it would not have been confronted with an attempt to prove its statement of the reason for termination was the truth. These contentions are based upon the defendant's position the statements were made in a quasi-judicial proceeding and were absolutely privileged. Defendant cites *White v. United Mills Co.*, 240 Mo.App. 443, 208 S.W.2d 803 (1948). Assuming such statements to be so privileged, that privilege appeared from the amended petition and could have been raised even before the defendant was permitted to amend its answer and assert this privilege. The plaintiff testified concerning the form and told the jury the statement made thereon without objection. Having failed to object to this evidence when it first entered the case,

the defendant waived any right to have it excluded. *Marshall v. Bobbitt*, 482 S.W.2d 439 (Mo.1972). Further, even though those forms could not be the basis of recovery for libel, they were admissible if they had probative value on another issue. *McIntosh v. Eagle Fire Company of New York*, 325 F.2d 99 (8th Cir. 1963). The defendant used those forms as an excuse for not responding to the plaintiff's request. They also had probative value on the issue of defendant's malice in not responding to that request. The plaintiff was entitled to the use of those statements to suggest to the jury the defendant intentionally did not issue a service letter. This upon the premises that had the defendant issued a service letter assigning the same reason for termination, the plaintiff could have sought to hold the defendant liable for not "truly stating for what cause, if any, such employee has quit such service . . . ." § 290.140.

■ The defendant next contends there was no competent evidence to support the submission of the issue of punitive damages upon the basis of legal malice. To support that contention, the defendant correctly states that legal malice is "the doing of a wrongful act intentionally without just cause or excuse." MAI 16.01. *Schmidt v. Central Hardware Company*, 516 S.W.2d 556 (Mo.App.1974). It then cites Graybeal's testimony that he did not issue a service letter because he was unaware of the service letter statute and thought the reply to the Kansas unemployment compensation form was sufficient. Its conclusion is that there was no evidence the defendant knew its failure was a wrongful act and Graybeal's testimony conclusively established the defendant was acting in good faith. This is not a case where the plaintiff's evidence established the defendant acted upon a mistake of fact such as *Thomas v. Commercial Credit Corporation*, 335 S.W.2d 703 (Mo. App.1960). The defendant's contention has been succinctly answered. "Consequently, inasmuch as defendant never responded to plaintiff's request for a service letter, a jury could find legal malice which alone would support punitive damages." *Schmidt*

*v. Central Hardware Company,* supra, 516 S.W.2d at 560. "Defendant has committed the common error of assuming that because its witness testified to something (that they did not supply the letter because they were unaware of the statute), the jury was bound by its evidence. Of course, the jury was not bound and could accept or reject such evidence as it saw fit." *Bubke v. Allied Building Credits, Inc.,* 380 S.W.2d 516, 522 (Mo.App.1964). The jury was not required to believe that Graybeal thought the reply to a Kansas unemployment form satisfied a Missouri statute cited to him. There was sufficient evidence to support the submission of punitive damages.

■ The defendant's final point is that the award of punitive damages is excessive. This point is to be reviewed under the maxim "[t]he amount to be awarded lies wholly within the sound discretion of the jury and a court will not interfere with the jury's assessment of punitive damages unless there is an abuse of discretion . . . or the size of the award is indicative of passion, prejudice or bias." *Beggs v. Universal C. I. T. Credit Corporation,* 409 S.W.2d 719, 724 (Mo.1966). The purpose of punitive damages is as an example and deterrent and as a punishment for wrongdoing. The deterrent aspect is of particular significance considering the remedial nature of the service letter statute which was enacted to correct a practice affecting a class of people. Factors to be considered include the defendant's worth and the aggravating or mitigating circumstances. *Beggs v. Universal C. I. T. Credit Corporation,* supra.

■ The defendant first points out the plaintiff did not show the net worth of the defendant. However, this omission is not fatal to the award. It is clear from the record the work was a major public project and could not have been undertaken by a company that did not have considerable assets. This is illustrated by the fact the defendant had approximately 34 employees on the job. There is a basis in the record from which the jury could conclude a sizable award was necessary to serve as a deterrent to repetition. Compare *Holcroft v. Missouri-Kansas-Texas Railroad Company,* No. KCD 30423, March 3, 1980 (Mo.App. 1980).

■ The defendant next argues the award is excessive because there is no discernible relationship between $1.00 actual damages and $27,500 punitive damages. It is true "generally, punitive damages must bear some relation to the injury inflicted and the cause thereof", *Beggs v. Universal C. I. T. Credit Corporation,* supra, 409 S.W.2d at 724, but "[t]here is no fixed relation between the amount of actual damages and the amount of punitive damages awarded." *State ex rel. St. Joseph Belt Ry. Co. v. Shain,* 341 Mo. 733, 742, 108 S.W.2d 351, 356 (1937). Again compare *Holcroft v. Missouri-Kansas-Texas Railroad Company,* supra, in which an award of $1.00 actual damages and $75,000 punitive damages was approved.

■ Lastly, the defendant urges the award is excessive because of Graybeal's proffered lack of knowledge of the service letter statute. Again, the defendant would overlook the right of the jury to reject that profession of ignorance. There are facts in evidence which the jury could conclude constituted aggravating circumstances. These include a termination without warning or explanation; the unexplained alteration of the plaintiff's personnel record from "quit" to "fired"; and Graybeal's incomplete report of his consultation with the local attorney. In view of the plaintiff's evidence concerning the inadequate plans, modification of plans and lack of tools and materials and lack of pretermination criticism of his work, the jury could have concluded the discharge was the result of one or more in management seeking to find a scapegoat for their own shortcomings. The jury could further conclude that Graybeal's inconsistent testimony attempting to establish an excuse demonstrated the defendant's willful refusal to issue a service letter and face the necessity of proving "Let go—unable to do the job required of him" was the true cause for discharge. This conclusion could have been considered to be fortified by the defendant's failure to issue a service letter in

mitigation of damages even after suit was filed. *Heuer v. John R. Thompson Co.*, 251 S.W.2d 980 (Mo.App.1952); *Van Sickle v. Katz Drug Co.*, 235 Mo.App. 952, 151 S.W.2d 489 (1941). In respect to punitive damages, "it is only in an extreme case that an appellate court will undertake to revise such an award." *Potter v. Milbank Manufacturing Company*, 489 S.W.2d 197, 206–207 (Mo. 1972). While the award was liberal, the defendant has not demonstrated the jury abused its discretion or that this is such an extreme case. *Potter v. Milbank Manufacturing Co.*, supra, $20,000 punitive damages; *Schmidt v. Central Hardware Company*, supra, $20,000 punitive damages; *Holcroft v. Missouri-Kansas-Texas Railroad Company*, supra, $75,000 punitive damages.

The judgment is affirmed.

BILLINGS, P. J., and HOGAN, J., concur.